1  KERRY R. BENSINGER, S.B. # 132178
   **BENSINGER, RITT, TAI & THVEDT, L.L.P.**
2  A Limited Liability Law Partnership
   65 N. Raymond Avenue, Suite 320
3  Pasadena, CA 91103
   Telephone:  (626) 685-2550
4  Facsimile:  (626) 685-2562

5  Attorney for Petitioner,
   ADAM MIRANDA

6

7

8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11  ADAM MIRANDA,                    )   Case No. CV 89-7130-AHM
                                     )
12           Petitioner,            )
                                     )   **DEATH PENALTY CASE**
13      v.                          )
    ROBERT L. AYERS, Jr., in his    )
14  capacity as Warden of San Quentin )
    Prison                          )   NOTICE OF RULING BY
15                                   )   CALIFORNIA SUPREME COURT
             Respondent.            )
16                                   )
                                     )
17  _____  )

18

19
            Pursuant to this Court Order dated November 20, 1996,  Petitioner, ADAM
20
    MIRANDA, hereby files the California Supreme Court's ruling.  The California
21
    Supreme Court's opinion is attached hereto as Exhibit A.
22

23

    Dated: June 23, 2008              Respectfully submitted,
24

25

26                                    _____
                                      KERRY R. BENSINGER
27                                    Counsel for Petitioner Adam Miranda

28

                                      1

# EXHIBIT A



182 P.3d 513                                                                                                      Page 1
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

**H**
In re Miranda
Cal.,2008.

Supreme Court of California
In re Adam MIRANDA on Habeas Corpus.
**Nos. S058528, S060781.**

May 5, 2008.

**Background:** Defendant was convicted of first-degree murder, assault with intent to commit murder, and first-degree burglary with findings on each count by jury in the Superior Court, Los Angeles County, No. 362694,Kathleen Parker, J., and was sentenced to death following special finding that killing was willful, deliberate and premeditated and that killing occurred as result of attempt to commit crime of robbery. Defendant's petition for writ of habeas corpus was consolidated with his appeal. On automatic death penalty review, the Supreme Court affirmed judgments and denied petition. Defendant pleaded guilty in the Superior Court, Los Angeles County, No. 372157, to another second degree murder, evidence of which had been introduced in aggravation in capital trial. Defendant challenged both convictions by petitions for habeas corpus, which were consolidated. The Supreme Court ordered evidentiary hearing and appointed Roger W. Krauel, J., of the Superior Court, San Diego County, as referee.

**Holdings:** The Supreme Court, Werdegar, J., held that:
(1) defendant did not receive exculpatory letter in prosecution's possession;
(2) prosecution was not entitled to access trial counsel's entire file to search for evidence of letter;
(3) preventing prosecution from asking defense counsel why he would have advised against guilty plea if he had letter was harmless error;
(4) prosecution had duty to disclose letter;
(5) prosecution had duties to disclose prisoners' statements that witness confessed to killing and to

disclose prosecution's bargains with prisoners;
(6) undisclosed evidence was significant factor in guilty plea; and
(7) undisclosed evidence entitled defendant to relief from second degree murder conviction upon guilty plea.

Writs granted; judgments vacated in part, with directions.

West Headnotes

**[1] Reference 327 ⊛99(4)**

327 Reference
   327III Report and Findings
      327k99 Operation and Effect
         327k99(4) k. Findings of Fact. Most Cited Cases
Although a referee's findings on factual questions are not binding on the Supreme Court, they are entitled to great weight when they are supported by substantial evidence.

**[2] Habeas Corpus 197 ⊛754**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)3 Hearing
         197k754 k. Reference. Most Cited Cases
The Supreme Court would adopt referee's findings in habeas corpus proceeding that counsel for death penalty defendant did not receive letter in prosecution's possession exculpating defendant of killing prior to entry of judgment upon guilty plea to second degree murder, or in death penalty case in which evidence of killing was introduced in aggravation, since referee's findings were supported by substantial evidence including prosecutors' lack of recollection of providing letter to defense, absence of any document indicating that letter had been logged into prosecution's file or reviewed by defense, and defense counsel's representation that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                    Page 2
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

they did not receive letter.

**[3] Habeas Corpus 197 &755;754**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)3 Hearing
            197k754 k. Reference. Most Cited Cases
The Supreme Court reviews the referee's discovery rulings in habeas corpus proceedings for abuse of discretion.

**[4] Habeas Corpus 197 &755;682**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)1 In General
            197k680 Return or Answer
               197k682 k. Production of Record or Transcript. Most Cited Cases
Referee in habeas corpus proceeding acted within his discretion in denying People's motion, in response to allegation that defendant did not receive exculpatory letter in prosecution's possession, for access to the entire contents of defendant's trial counsel's files, and instead permitting a subpoena duces tecum or request for production of documents seeking only items potentially relevant; People's motion was overbroad in seeking access to materials having nothing to do with issues presented in case.

**[5] Witnesses 410 &755;219(3)**

410 Witnesses
   410II Competency
      410II(D) Confidential Relations and Privileged Communications
         410k219 Waiver of Privilege
            410k219(3) k. Communications to or Advice by Attorney or Counsel. Most Cited Cases
Defendant's previous habeas corpus petition alleging ineffective assistance of counsel did not waive the attorney-client privilege in later habeas proceedings relating to prosecution's failure to disclose exculpatory evidence. West's Ann.Cal.Evid.Code § 958.

**[6] Habeas Corpus 197 &755;480**

197 Habeas Corpus
   197II Grounds for Relief; Illegality of Restraint
      197II(B) Particular Defects and Authority for Detention in General
         197k480 k. Discovery and Disclosure. Most Cited Cases
Referee in habeas corpus proceeding did not significantly mischaracterize prosecutor's closing argument in penalty phase of capital trial by concluding prosecutor asserted that there was no evidence that prosecution's witness rather than defendant committed uncharged murder offered in aggravation, as supported finding that defense would have used evidence of witness's confessions to other prisoners to rebut prosecution's argument had prosecution disclosed such evidence, where prosecutor stated that "if there were other people out there who were friends of," defendant who knew that witness committed the murder, since witness had "eliminated himself from the neighborhood and disappeared and become a rat, those people could have certainly been brought forward by the defense"; argument was not limited to the claim that none of defendant's neighbors or friends could have exculpated him.

**[7] Habeas Corpus 197 &755;754**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)3 Hearing
             197k754 k. Reference. Most Cited Cases
Finding of referee in habeas corpus proceeding that prisoner's statement was credible in claiming that prosecution's witness confessed to uncharged murder offered in aggravation against defendant in penalty phase of capital trial, in concluding that if

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                              Page 3
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

such statements had been disclosed defense could have used them to rebut allegation that defendant committed the murder, was supported by substantial evidence including prisoner's claim that he only previously accused someone else of the murder because witness threatened him, and statements of four other prisoners that witness confessed to the murder.

**[8] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing
                197k754 k. Reference. Most Cited Cases
Finding of referee in habeas corpus proceeding, that defense could have effectively cross-examined witness using prisoners' statements that witness confessed to uncharged murder offered in aggravation against defendant in penalty phase of capital trial, in concluding that undisclosed evidence could have been used to rebut allegation that defendant committed the murder, was supported by substantial evidence.

**[9] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing
                197k754 k. Reference. Most Cited Cases
Finding of referee in habeas corpus proceeding, that prisoners' statements that prosecution witness confessed to uncharged murder offered in aggravation against defendant in penalty phase of capital trial would have led to useful defense evidence, in concluding that undisclosed evidence could have been used to rebut allegation that defendant committed the murder, was supported by substantial evidence, including evidence that prisoners themselves would have been available as witnesses.

**[10] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing
                197k754 k. Reference. Most Cited Cases
Finding of referee in habeas corpus proceeding, that the information that prosecution had made bargains with prisoners for their agreement to testify that prosecution's witness, rather than defendant, had committed the uncharged murder offered in aggravation against defendant in penalty phase of capital trial would have led to useful defense evidence, in concluding that undisclosed evidence could have been used to rebut allegation that defendant committed the murder, was supported by substantial evidence.

**[11] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing
                197k754 k. Reference. Most Cited Cases
In determining whether defendant would have pleaded guilty to second degree murder even if prosecution had disclosed to defense that prosecution had made bargains with prisoners for their testimony that prosecution's witness had confessed to the killing, referee in habeas corpus proceeding improperly prevented prosecution from questioning defense counsel as to basis for his assertion he would have advised defendant not to plead guilty; prosecution should have been allowed to test credibility of counsel's assertion.

**[12] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                         Page 4
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

197k754 k. Reference. Most Cited Cases
Any error committed by referee in habeas corpus proceeding was harmless, in preventing prosecution from questioning defense counsel as to basis for his assertion he would have advised defendant not to plead guilty to second degree murder if prosecution had disclosed that it had made bargains with prisoners for their testimony that prosecution's witness had confessed to the killing; it was credible that a competent attorney in possession of that evidence would have advised against guilty plea.

**[13] Habeas Corpus 197 €═══480**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k480 k. Discovery and Disclosure. Most Cited Cases
In determining whether evidence not disclosed by prosecution in capital murder trial, that prosecution had made bargains with prisoners for their testimony that prosecution's witness had confessed to uncharged killing offered in aggravation in penalty phase, would have led to useful defense evidence, referee in habeas corpus proceeding acted within his discretion in excluding from evidence the statement of a prisoner who claimed that defendant himself confessed to the killing, since possibility of rebutting the undisclosed evidence would not have prevented it from being useful to defense, and prisoner whose statement was excluded was a "surprise witness" whose statement was not included in parties' submission to the Supreme Court's reference order.

**[14] Reference 327 €═══63**

327 Reference
    327II Referees and Proceedings
        327k62 Reception of Evidence
            327k63 k. In General. Most Cited Cases
A reference hearing following issuance of an order to show cause is subject to the rules of evidence.

West's Ann.Cal.Evid.Code § 300.

**[15] Criminal Law 110 €═══419(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(N) Hearsay
            110k419 Hearsay in General
                110k419(1) k. In General. Most Cited Cases
Under the rules of evidence, an out-of-court declaration is hearsay, and unless subject to some exception permitting it to be admitted, should be excluded upon timely and proper objection. West's Ann.Cal.Evid.Code § 1200.

**[16] Habeas Corpus 197 €═══754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)3 Hearing
                197k754 k. Reference. Most Cited Cases
Prisoner's statement that defendant confessed to killing was inadmissible hearsay in reference hearing following issuance of order to show cause in habeas corpus proceeding, absent an agreement by the parties as to its admission. West's Ann.Cal.Evid.Code § 1200.

**[17] Habeas Corpus 197 €═══714**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)2 Evidence
                197k714 k. Weight and Sufficiency in General. Most Cited Cases
When a prisoner collaterally attacks a judgment by petition for writ of habeas corpus, he or she bears the burden of alleging and proving, by a preponderance of the evidence, the facts supporting his or her claim for relief.

**[18] Habeas Corpus 197 €═══674.1**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                              Page 5
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

197 Habeas Corpus
   197III Jurisdiction, Proceedings, and Relief
      197III(C) Proceedings
         197III(C)1 In General
           197k674 Allowance and Issuance of Writ or Rule to Show Cause
              197k674.1 k. In General. Most Cited Cases

In issuing an order to show cause in a habeas corpus proceeding, a court makes an implicit preliminary determination as to claims within the order that the petitioner has made a sufficient prima facie statement of specific facts which, if established, entitle him to relief.

**[19] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
           92k4592 Disclosure and Discovery
              92k4594 Evidence
                 92k4594(1) k. In General. Most Cited Cases

The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment. U.S.C.A. Const.Amend. 14.

**[20] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
           92k4592 Disclosure and Discovery
              92k4594 Evidence
                 92k4594(1) k. In General. Most Cited Cases

**Constitutional Law 92 ☞4594(4)**

92 Constitutional Law

92XXVII Due Process
   92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
         92k4592 Disclosure and Discovery
           92k4594 Evidence
             92k4594(2) Particular Items or Information, Disclosure of
              92k4594(4) k. Witnesses. Most Cited Cases

Evidence is "favorable," as would support a due process duty for the prosecution to disclose it to the defendant, if it helps the defense or hurts the prosecution, as by impeaching one of the prosecution's witnesses. U.S.C.A. Const.Amend. 14.

**[21] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
           92k4592 Disclosure and Discovery
              92k4594 Evidence
                 92k4594(1) k. In General. Most Cited Cases

Evidence is "material," as would support a due process duty for the prosecution to disclose it to the defendant, only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. U.S.C.A. Const.Amend. 14.

**[22] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
           92k4592 Disclosure and Discovery
              92k4594 Evidence
                 92k4594(1) k. In General. Most Cited Cases

A reasonable probability exists that, had evidence been disclosed to the defense at trial, the result would have been different, meaning that the evidence was "material," as would support a due pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                    Page 6
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

cess duty for the prosecution to disclose it to the defendant, when the undisclosed evidence reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict. U.S.C.A. Const.Amend. 14.

**[23] Constitutional Law 92 ⚙═➤4745**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(H) Criminal Law
        92XXVII(H)6 Judgment and Sentence
          92k4741 Capital Punishment; Death Penalty
            92k4745 k. Proceedings. Most Cited Cases

**Sentencing and Punishment 350H ⚙═➤1746**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)1 In General
          350Hk1746 k. Other Discovery and Disclosure. Most Cited Cases
Letter in which prisoner described prosecution witness's alleged confession to uncharged killing offered against defendant as aggravating circumstance in penalty phase of capital murder trial was "favorable" to defendant, as supported due process duty for the prosecution to disclose it to the defense, where letter involved primary penalty phase witness's detailed admissions, inconsistent with his trial testimony inculpating defendant, of the witness's own actions in killing victim, destroying evidence, and developing a false alibi to deflect suspicion. U.S.C.A. Const.Amend. 14.
*See 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 41; Cal. Jur. 3d, Criminal Law: Rights of the Accused, § 206.*
**[24] Constitutional Law 92 ⚙═➤4745**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(H) Criminal Law
        92XXVII(H)6 Judgment and Sentence

          92k4741 Capital Punishment; Death Penalty
            92k4745 k. Proceedings. Most Cited Cases

**Sentencing and Punishment 350H ⚙═➤1746**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)1 In General
          350Hk1746 k. Other Discovery and Disclosure. Most Cited Cases
Letter in which prisoner described prosecution witness's alleged confession to uncharged killing offered against defendant as aggravating circumstance in penalty phase of capital murder trial was "material," as supported due process duty for the prosecution to disclose it to the defense, since counsel could have used letter to effectively impeach witness's testimony on cross-examination and to investigate and present evidence of witness's guilt, and could have obtained prisoner as a witness. U.S.C.A. Const.Amend. 14.

**[25] Sentencing and Punishment 350H ⚙═➤1766**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(G) Proceedings
        350HVIII(G)2 Evidence
          350Hk1755 Admissibility
            350Hk1766 k. Hearsay. Most Cited Cases
Prisoners' statements and letter, asserting that prosecution witness had confessed to uncharged killing offered against defendant as aggravating circumstance in penalty phase of capital murder trial, would have been admissible under exception to hearsay rule for prior inconsistent statements, since witness would have had opportunity to explain or deny his alleged confession. West's Ann.Cal.Evid.Code §§ 770, 1235.

**[26] Constitutional Law 92 ⚙═➤4594(1)**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                           Page 7
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
          92k4594 Evidence
            92k4594(1) k. In General. Most
Cited Cases

**Criminal Law 110 ⚖➞661**

110 Criminal Law
  110XX Trial
    110XX(C) Reception of Evidence
      110k661 k. Necessity and Scope of Proof.
Most Cited Cases
The trial judge, not the prosecutor, is the arbiter of
admissibility of evidence, and the prosecutor's due
process obligations to disclose evidence material
and favorable to a criminal defendant cannot turn
on the prosecutor's view of whether or how defense
counsel might employ particular items of evidence
at trial. U.S.C.A. Const.Amend. 14.

**[27] Constitutional Law 92 ⚖➞4594(1)**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)4 Proceedings and Trial
        92k4592 Disclosure and Discovery
          92k4594 Evidence
            92k4594(1) k. In General. Most
Cited Cases
To the extent the prosecutor is uncertain about the
materiality of a piece of evidence, the prudent pro-
secutor will resolve doubtful questions in favor of
disclosure under due process obligation to disclose
evidence material and favorable to a criminal de-
fendant. U.S.C.A. Const.Amend. 14.

**[28] Constitutional Law 92 ⚖➞4745**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law

92XXVII(H)6 Judgment and Sentence
  92k4741 Capital Punishment; Death
Penalty
      92k4745 k. Proceedings. Most
Cited Cases

**Sentencing and Punishment 350H ⚖➞1746**

350H Sentencing and Punishment
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)1 In General
        350Hk1746 k. Other Discovery and
Disclosure. Most Cited Cases
Evidence that prisoners described prosecution wit-
ness's alleged confession to uncharged killing
offered against defendant as aggravating circum-
stance in penalty phase of capital murder trial, and
obtained bargains from prosecution in exchange for
testimony against witness, was "favorable" to de-
fendant, as supported due process duty for the pro-
secution to disclose it to defense, since testimony
likely would have led to jury's hearing of witness's
repeated, detailed admissions to stabbing victim,
destroying evidence, and developing a false alibi,
all of which were inconsistent with his trial testi-
mony inculpating defendant and claiming to have
tried to stop the killing. U.S.C.A. Const.Amend. 14.

**[29] Constitutional Law 92 ⚖➞4745**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)6 Judgment and Sentence
        92k4741 Capital Punishment; Death
Penalty
          92k4745 k. Proceedings. Most
Cited Cases

**Sentencing and Punishment 350H ⚖➞1746**

350H Sentencing and Punishment
  350HVIII The Death Penalty
    350HVIII(G) Proceedings
      350HVIII(G)1 In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                            Page 8
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

350Hk1746 k. Other Discovery and Disclosure. Most Cited Cases
Evidence that prisoners described prosecution witness's alleged confession to uncharged killing offered against defendant as aggravating circumstance in penalty phase of capital murder trial, and obtained bargains from prosecution in exchange for testimony against witness, was "material" to jury's death penalty determination, as supported due process duty for the prosecution to disclose it to the defense, even if evidence was consistent with defendant's guilt of uncharged murder on aiding and abetting theory, since if defense had been able to illuminate the pressure on witness to testify against defendant to avoid prosecution for the same murder, it was reasonably probable jury would have discounted witness's testimony. U.S.C.A. Const.Amend. 14.

**[30] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery
                    92k4594 Evidence
                        92k4594(1) k. In General. Most Cited Cases
The prosecution's due process obligation to disclose evidence to defense turns on the collective effect of all suppressed evidence favorable to the defense, not on the effect of such evidence considered item by item. U.S.C.A. Const.Amend. 14.

**[31] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery
                    92k4594 Evidence
                        92k4594(1) k. In General. Most Cited Cases
The definition of "materiality" in terms of the cumulative effect of suppression must be seen as leaving the government with a degree of discretion in compliance with the due process obligation to disclose evidence to the defense, but must also be understood as imposing a corresponding burden. U.S.C.A. Const.Amend. 14.

**[32] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery
                    92k4594 Evidence
                        92k4594(1) k. In General. Most Cited Cases
Showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a violation of the due process obligation to disclose evidence to the defense, without more. U.S.C.A. Const.Amend. 14.

**[33] Constitutional Law 92 ☞4594(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)4 Proceedings and Trial
                92k4592 Disclosure and Discovery
                    92k4594 Evidence
                        92k4594(1) k. In General. Most Cited Cases
The prosecution, which alone can know what is undisclosed, has the responsibility in complying with the due process obligation to disclose evidence to the defense to gauge the likely net effect of all such evidence and make the disclosure upon reaching the point of "reasonable probability" that disclosure would change the outcome of the case. U.S.C.A. Const.Amend. 14.

**[34] Habeas Corpus 197 ☞754**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                      Page 9
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

197III(C) Proceedings
197III(C)3 Hearing
197k754 k. Reference. Most Cited Cases
Finding of referee in habeas corpus proceeding, that prosecution witness's testimony in penalty phase of capital murder trial that defendant committed uncharged killing offered in aggravation was significant factor in defendant's attorney's decision to advise defendant to plead guilty to second degree murder based on same incident, as supported due process duty in second degree murder proceeding for prosecution to disclose evidence that witness had confessed to killing and that prisoners obtained bargains from prosecution in exchange for testimony against witness, was supported by substantial evidence including statement of attorney. U.S.C.A. Const.Amend. 14.

**[35] Constitutional Law 92 4594(4)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(4) k. Witnesses. Most Cited Cases

**Constitutional Law 92 4594(5)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(2) Particular Items or Information, Disclosure of
92k4594(5) k. Agreements. Most Cited Cases

**Criminal Law 110 2001**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other Particular Issues. Most Cited Cases
Evidence that prisoners described prosecution witness's alleged confession to killing, and obtained bargains from prosecution in exchange for testimony against witness, was not merely impeachment evidence, which due process would not have required prosecution to disclose before entering into plea bargain with defendant; evidence also would have tended to exculpate petitioner by showing that another person did the killing, and thus disclosure prior to plea agreement was required. U.S.C.A. Const.Amend. 14.

**[36] Criminal Law 110 2001**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)2 Disclosure of Information
110k1993 Particular Types of Information Subject to Disclosure
110k2001 k. Other Particular Issues. Most Cited Cases
Prosecution's due process violations in failing to disclose prisoners' statements describing prosecution witness's alleged confession to murder offered in aggravation against death penalty defendant, and bargains granted to prisoners in exchange for testimony that witness committed the murder, entitled defendant to relief from his second degree murder conviction arising from his guilty plea, after being sentenced to death, to the murder that had been offered in aggravation, where prosecution witness's testimony was significant factor in defendant's attorney's decision to advise defendant to plead guilty. U.S.C.A. Const.Amend. 14.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                           Page 10
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

***178 Kerry R. Bensinger, Pasadena, George R. Hedges and David Pettit, Los Angeles, under appointments by the Supreme Court, for Petitioner Adam Miranda.

Daniel E. Lungren, Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Sanjay T. Kumar, Robert S. Henry, Frederick Grab, Pamela C. Hamanaka, Susan Lee Frierson, Donald E. de Nicola, James William Bilderback II, Michael A. Katz and J. Michael Lehmann, Deputy Attorneys General, for Respondent State of California.

WERDEGAR, J.

*544 **518 Petitioner Adam Miranda is confined at San Quentin State Prison pursuant to a September 17, 1982, judgment of death rendered in the Los Angeles County Superior Court. In that proceeding, petitioner was convicted, inter alia, of the first degree murder of Gary Black (Pen.Code, §§ 187, 189),[FN1] with a finding that the murder was committed while petitioner was engaged in the attempted commission of a robbery (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)). We affirmed petitioner's conviction (*People v. Miranda* (1987) 44 Cal.3d 57, 241 Cal.Rptr. 594, 744 P.2d 1127) and denied three prior habeas corpus petitions challenging his conviction ***179 and sentence (*In re Miranda*, Nov. 12, 1991, Cr. 25350; *In re Miranda*, June 21, 1989, S007965; *In re Miranda*, Oct. 13, 1993, S028518).

> FN1. Except where otherwise noted, unlabeled statutory references are to the Penal Code.

The only evidence introduced in aggravation during the penalty phase of petitioner's trial concerned the killing of Robert Hosey some two weeks before the capital crime. (After the conclusion of the capital trial, petitioner pleaded guilty to the second degree murder of Hosey, and a judgment of guilt was entered on February 1, 1983.) Joe Saucedo testified that petitioner stabbed Hosey after an argument over "bunk" (cigarettes falsely claimed to be laced with phencyclidine (PCP)) that Hosey had sold to Saucedo and another individual. Saucedo had been charged with the murder of Hosey, but in exchange for his agreement to testify against petitioner, the charge was reduced to assault with a deadly weapon, and on his plea of guilty, he was granted probation.

*545 At the time of petitioner's capital trial, the prosecution possessed a letter written by Los Angeles County jail inmate Larry Montez (the Montez letter) recounting Saucedo's admission to Montez that he had personally killed Hosey. The Montez letter contradicted Saucedo's testimony at petitioner's capital trial that petitioner had stabbed Hosey while he (Saucedo) had tried to stop the killing.[FN2] **519 In his habeas ***180 corpus petition challenging his death sentence in the Black case, petitioner alleged the Montez letter could have been used to effectively impeach Saucedo's testimony and thus was material favorable evidence, and the prosecution's nondisclosure of the letter violated its obligations under *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215(*Brady* ). Petitioner also alleged that three other individuals ("Jimmie Barnes," Marvin Sanchez, and Steven McDonald), to whom *546 Saucedo had admitted his participation in the Hosey stabbing, had advised the Los Angeles County District Attorney's Office of their knowledge and willingness to testify against Saucedo in the Hosey case. Petitioner further alleged that Barnes and Sanchez, as well as Montez, were provided benefits (money or favorable dispositions in unrelated criminal matters) in return for their willingness to testify against Saucedo, and that the prosecution in petitioner's capital case had used these undisclosed facts to pressure Saucedo into testifying against petitioner. Petitioner alleged these facts could have been used at his capital trial to impeach Saucedo's testimony by showing Saucedo had a motive to testify favorably to the prosecution. In a separate petition, petitioner alleged the same facts as a basis for challenging his second degree murder conviction in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                          Page 11
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

Hosey case. We ordered the two petitions consolidated.

FN2. The handwritten letter, which was first disclosed to petitioner in 1996 through discovery in federal habeas corpus proceedings, reads as follows:

"I ask him about his Crim.

"Oct-23 80

"Joe Antonio Saucedo his Eighteen YeAr Old. his In My dorm-3300, his Cellblock Is Number 16. I Was Asking him About his Case he told Me to Sware that I Won't Snich On him So I told him thAt Won't Snich!

"this is What he told Me And Asacly the SAme Way Im Going to Write It. At first he told Me that he StAped him. So I told him If he WAs Shore that he StApe him, he told Me thAt One Of his homboy StAped him. So I Ask him WhAt WAs his NAme he told Me TomAs. AnywAy I wAnt him to tell Me the Story how It ReAlly hAppen Ok this WhAt he told Me.

"He WAs At his Girlfriend And One Of his homeboy Came Over his Girl friend House! And Ask him If he Know Ware to Get Some Angel dust! So he told him thAt he Know Ware to Get Some. So his homeboy Ask him to tAke him. So Joe Antonio Saucedo told him to Wait that his Going to Ask his Girlfriend If he Could Go So he Ask her And She told him to Go. but to Come back fast So!-they Went, he told Me thAt he Want to A blackdud house but thAt he WAsnt around! he didn't told Me thAt they Knocked At the door, but that they Want by his house. So then they So him down the block So they Went to him And Joe

Antonio Saucedo Asked him to Get him A dime Of Cools As Known As Angel dust. So TomAs Gave him the Money And he Went to Get the Cool When he CAme back he told Me thAt the Cool didn't Smell Like dust So then thay told him thAt the Cool WAsn't No Go. So then the blAck Guy told him thAt he Going to Go bAck And Get the Money bAck. So toMAs told him to Get On the CAr thAt he And Joe Antonio WAs Going With him. So the blAckguy Get On the CAr And he told Me that they Went Around the Corner but thAt they didn't found the Guy thAt Sold the Cool to the blackGuy. So toMAs diseded to tAke him to the barrio. So Joe Antonio Saucedo told Me thAt befor Geting to the bArrio thAt he told the blACK Guy to Jump Off the CAr. but thAt he didn't! So WhAn they Got to the bARRio he told Me that thay Got Off the CAr And then TomA told his homeboy Toro thAt the MAjAte, Sold him Some fuckup Cools And thAt they WAsn't No Good So toro hite him Ones! So then the blAckdud Got ScAre And Run So then he told Me thAt he So his home boys Runing After him And thAt Nobody Couldn't Cash him. So Joe Antonio Saucedo Ran After him And Cout him by his Short from the back Of his Neck. he told Me thAt When he Cout him he told him that him And tomAs Wore Going to tAke him bACK, but thAt he WAnted to Run. And tomAs Came And [illegible] him And Joe Antonio Saucedo toKe A Knife Out And StAped him. he didn't told Me how Many time, but he told Me thAt he knows WAre the Knife Is. At the End he told Me thAt his Girlfriend Is Going to testefid. In Court thAt his WAs With her At the Movie, but he told Me thAt Shes lie for him Cause She Loves him. he SAy thAt he WAsn't With

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                           Page 12
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

her I Ask him how does it fill StApping A Preson he SAy like StApping A WAter Melon. then it wAs court time Saucedo told that he throw the Knife And the White hat in the River Cause that Was [illegible] to hide the Evidence.

"Joe Antonio Saucedo"Dorm 3300 Bk. 5846-009

"11/13/80. Lyle Mayer # 12772

"Obtained this from"Me.

"Pending other information

"Larry Montez

"Louis Berman"# 15099"

We issued an order to show cause why petitioner should not be granted relief from his death sentence and his second degree murder conviction on the ground the prosecution had failed to disclose material exculpatory evidence as alleged. Respondent denied petitioner's allegation that the prosecution **520 had failed to disclose the evidence. We subsequently ordered an evidentiary hearing and appointed as referee the Honorable Roger W. Krauel, Judge of the San Diego County Superior Court, to determine whether petitioner's trial counsel had actually received the Montez letter before entry of judgment in the Black and Hosey cases. The referee's report supported petitioner's allegation that his trial counsel had never received the Montez letter.

Upon consideration of the referee's first report, we ordered that a second reference hearing be conducted and directed Judge Krauel to take additional evidence and make findings of fact on several specific questions. Judge Krauel subsequently conducted a second hearing, taking both documentary *547 and testimonial evidence. On August 20, 2004, he filed his second report. The second report, like the first, supports petitioner's allegation that his trial counsel did not receive the Montez letter.

The referee's second report also finds that the prosecution had in its possession before the penalty phase of petitioner's capital trial numerous additional items of evidence pointing to Saucedo's having killed Hosey that were not disclosed to the defense. Had these items been timely disclosed, the second report finds, the defense would have used them to effectively cross-***181 examine Saucedo, impeaching him on a matter that was of major significance concerning whether the penalty jury would recommend life in prison or the death penalty for petitioner.

The referee's second report further finds that Larry Montez wrote the Montez letter while he occupied a jail cell next to Saucedo's and signed the letter either during or after an interview with detectives. The report details Judge Krauel's findings that the information contained in the Montez letter is credible, that Saucedo's confession to Montez is corroborated by evidence from several other persons (to each of whom Saucedo gave similar confessions), that the prosecution had sufficient belief in the credibility of the information contained in the Montez letter that it entered into an arrangement with Montez (for early release on a jail sentence) to secure his future testimony against Saucedo, and that petitioner's trial counsel would have effectively cross-examined Saucedo regarding the information contained in the Montez letter had it been timely disclosed. The second report finds that Montez would have been available as a witness to the defense and would have testified credibly in the penalty phase of petitioner's capital trial, in conformity with what he had stated in his letter.

The referee's second report further finds that Saucedo made statements to Jimmie Barnes, Marvin Sanchez, and Steven McDonald about his role in the Hosey killing that differed from his testimony at petitioner's capital trial and that paralleled, in each case, the account of his confession contained in the Montez letter. Additionally, the second report finds that disclosure to petitioner's trial counsel of information about the prosecution's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                   Page 13
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

arrangements with Barnes and Sanchez would have led to useful defense evidence and that, had the evidence been disclosed to petitioner, his trial counsel in the Hosey case would have advised him not to plead guilty, and he would not have so pleaded.

In sum, the referee's second report, like the first, generally supports petitioner's allegations. Accordingly, and for the reasons more fully explained below, we conclude petitioner has demonstrated entitlement to relief.

## *548 BACKGROUND

### Evidence presented at trial

The facts of record concerning both the Black murder and the Hosey murder are recited in our opinion in petitioner's direct appeal. (*People v. Miranda, supra,* 44 Cal.3d at pp. 71-75, 241 Cal.Rptr. 594, 744 P.2d 1127.) Evidence in the Black case showed, in brief, that shortly after 2:00 a.m. on September 27, 1980, petitioner and his codefendant, Arnold Gonzalez, entered an AM-PM minimarket in Los Angeles and asked to buy beer. Gary Black and Kelly Chandler were working behind the counter. Chandler said it was too late to buy beer. Gonzalez then asked to buy a pack of cigarettes and handed Chandler a dollar. As Chandler was giving Gonzalez his change, he noticed petitioner pointing a gun at him. **521 Petitioner said, "This is a holdup ... put all the money in a brown paper bag." Black replied, "Okay." Black looked in the direction of a television on which the store's security system displayed a picture of activities at the scene. Immediately thereafter, there was a gunshot and Chandler began to yell and scream; Black had been wounded. Gonzalez grabbed petitioner's shirt and tried to get him to leave the store, urging him to shoot Chandler. Petitioner fired two shots at Chandler and fled. Chandler crawled to the telephone and was able to call an operator to report the shooting. Donna Navarro, a customer who was then filling her car's gas tank outside the store, testified***182

she heard a shot, some screaming, and a few more shots. She then saw Gonzalez, followed by petitioner, leaving the store. She was certain of her identification of petitioner because she had attended junior or high school with him. Black died as a result of the shooting; Chandler suffered injuries requiring two hospitalizations and emotional trauma for which he spent 10 days in a mental hospital. At trial, petitioner admitted shooting Black and Chandler, but denied having intended to rob the store.

Evidence about the killing of Robert Hosey, which occurred approximately two weeks before the robbery and murder of Gary Black, was the only aggravating evidence the prosecution presented at the penalty phase. As set forth in our opinion, Saucedo testified as follows: "On September 12, 1980, he and Tomas Martinez bought two PCP cigarettes from Hosey. After the purchase, Saucedo and Martinez discovered the cigarettes did not contain PCP. The two men then took Hosey in Martinez's vehicle and drove around looking for the person from whom Hosey had obtained the cigarettes. They were unable to find this individual and drove to Saucedo's residence.

"When they arrived at Saucedo's house, a number of individuals, including [petitioner], began arguing with Hosey concerning the 'bunk' he had sold to Martinez and Saucedo. Saucedo observed a knife in Hosey's back pocket and removed it. [Petitioner] asked for the knife and Saucedo gave it to him. *549 During the argument, someone pushed Hosey down to the ground. Hosey got up and began running down the street. [Petitioner] ran after him. Martinez and Saucedo reentered Martinez's car and began chasing Hosey. Shortly thereafter Saucedo got out of the car, ran towards Hosey, and tripped him. At this point [petitioner] 'jumped on top of [Hosey] and started stabbing him.' Hosey tried to stand up and begged [petitioner] not to kill him. [Petitioner] grabbed Hosey by the hair and continued stabbing him. Saucedo tried to separate the two men, and in the process, Saucedo 'got stabbed in the hand.' Saucedo returned to his car and found a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                        Page 14
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

shirt which he put around his hand to stop the bleeding. Hosey later died as a result of multiple stab wounds to the face and neck.

"Saucedo also testified that when they first arrived at his house, several girls, including Patricia Torres, were standing outside. At trial, Patricia Torres did not recall the events of that evening. She had made a prior statement, under oath, at the district attorney's office, and portions were read into the record at trial. In the prior statement, Torres had corroborated Saucedo's version of the events. She stated that when Saucedo and Martinez brought the man (later identified as Hosey) to the apartment, she thought Hosey had 'ripped [Martinez] off.' She noticed that [petitioner] had a knife and was telling Hosey to give back the money. [Petitioner] was holding the knife about two inches away from Hosey's neck. Torres saw someone push Hosey onto the ground. Hosey then ran down the street. Torres noticed [petitioner] and 'two other guys' following after Hosey. Martinez and Saucedo then got in the car and went down the street. Later in the evening Saucedo returned with his hand wrapped in a blood-soaked shirt.

"Saucedo was charged with murder with respect to the death of Hosey. In exchange for his agreement to testify, the charge was reduced to assault with a deadly weapon, and, upon a plea of guilty, he was given probation.

"[Petitioner] did not testify nor did he present any mitigating evidence at the penalty phase. At the time, he had been charged but not tried for the Hosey murder."***183 **522(*People v. Miranda, supra,* 44 Cal.3d at pp. 92-93, 241 Cal.Rptr. 594, 744 P.2d 1127, fn. omitted.)

**Evidence presented at the first reference hearing**

At the first reference hearing, the declarations of Joe Ingber and H. Clay Jacke, Sr., petitioner's appointed trial counsel in the Black case, were received into evidence by stipulation, and both attor-

neys testified in person. Each stated he was never told about, was never aware of, and had never received the Montez letter prior to entry of judgment.

Ingber, petitioner's lead trial counsel, testified he first saw the Montez letter in 1996, when petitioner's current counsel showed it to him. Had he *550 been aware of the letter while he was representing petitioner, Ingber stated, he would have conducted petitioner's defense differently and could have used the letter to "decimate" Saucedo's testimony on cross-examination. Had he received the letter, he would have maintained it in his case file, which he maintained in storage until 1991, when he turned it over to a representative of current counsel's firm. Ingber wrote letters seeking discovery to then Deputy District Attorneys Lance Ito and Frederick Horn, the assigned prosecutors during pretrial proceedings, and filed one motion for discovery. Ito never informed Ingber of the existence of an "open file policy," and Ingber was unaware of any procedure in Los Angeles County permitting defense counsel to examine a prosecutor's witness files.

H. Clay Jacke, Sr., was appointed as cocounsel for petitioner on March 24, 1982, about two and one-half months before petitioner's capital trial began. He received from Ingber and examined a copy of the "murder book," containing materials investigating and arresting officers had compiled in the case. Murder books typically contain *Brady* material. (See *Brady, supra,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.) The murder book did not contain the Montez letter. Jacke did not have an understanding with the district attorney permitting him to go to the latter's office to review his files and had never heard of the term, "open file policy." Nor, when Jacke later tried a case being prosecuted by Ito, did Ito indicate he would provide discovery through any such policy. Jacke was certain he had never seen the Montez letter because it was unique, being a confession to the crime by a witness in the case and memorably contained the word "majate," a derogatory reference to Blacks. Had he received the letter, he would have taken steps at trial that he did

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                    Page 15
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

not take, such as interviewing and subpoenaing Montez as a witness, cross-examining Saucedo about his statements as recounted in the Montez letter, interviewing Detective Lyle Mayer regarding the circumstances of his receipt of the letter, and obviating or rebutting the prosecution's closing argument that no evidence existed that Saucedo killed Hosey because the defense had presented no such evidence.

The March 17, 1997, declaration of Attorney Albert Garber was received into evidence by stipulation. Garber was petitioner's appointed trial counsel in the Hosey murder case, which trailed the Black case. In the penalty phase of the Black case, the People introduced in aggravation evidence about the Hosey killing. After petitioner received the death penalty for killing Black, the prosecution pursued a first degree murder charge against him in the Hosey matter and an allegation of multiple murder (based on the Black conviction). Petitioner, on Garber's advice, pleaded guilty to the second degree murder of Hosey, with the agreement that if the Black conviction were to be reversed on appeal the People would not amend the ***184 information in that case to charge multiple murders. As the factual basis for the plea in the Hosey case, the court relied on the testimony from the penalty phase of the Black case.

*551 Garber declared he was never told about, was unaware of, and did not receive the Montez letter prior to the entry of judgment in the Hosey case. Garber maintained his case file intact until 1992, when he allowed petitioner's current counsel to review and copy it.

Charlotte Strother, a paralegal for petitioner's habeas corpus counsel with the law firm known then as Caldwell, Leslie, Newcombe, & Pettit, had been responsible for maintaining petitioner's case files since 1990. **523 In the course of her duties, Strother went to the police department to obtain a copy of the murder books relating to the Black and Hosey cases. She did not find the Montez letter in either the Black or Hosey murder books. She had

obtained and personally copied Ingber's case file on petitioner and had kept it intact since. The Montez letter is not and was not in Ingber's file. Letters from Ingber to the prosecutor requesting discovery and from the prosecutor to Ingber providing discovery, however, were in the file. Strother also obtained and copied Garber's file on petitioner; the Montez letter was not there.

The referee also received evidence from the three prosecutors who handled petitioner's capital case during its progress through the municipal and superior courts: then Deputy District Attorneys Lance Ito (now a judge of the Los Angeles County Superior Court), Frederick Horn (now a judge of the Orange County Superior Court), and Curt Hazell (now a special operations assistant district attorney). By stipulation, the declarations of the three prosecutors were admitted into evidence; Judge Ito also testified at the hearing.

Judge Ito was the deputy district attorney assigned to petitioner's case through the preliminary hearing. He recalled seeing the Montez letter during the time he was prosecuting petitioner's case. The letter was in a manila clasp-type envelope in the rear of a file folder. Judge Ito testified that he did not recall disclosing or delivering the Montez letter to petitioner's trial counsel. He kept an inventory of the materials he received and filed in petitioner's cases, and the Montez letter is not listed thereon. When sending discovery material through the mail to defense counsel, his custom and practice, although not invariable, was to create a cover letter identifying the enclosed documents. It was also his custom and practice to use a standard district attorney's office form on which defense counsel were to acknowledge their review of discoverable materials at the district attorney's office; the form normally would be kept in the district attorney's files. No form reflecting that trial counsel in petitioner's cases had reviewed the district attorney's files existed.

When he was a prosecutor, Judge Ito maintained an "open file policy"; his practice was to invite defense counsel to review his file, and although he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                                Page 16
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

**\*552** could not specifically recall doing so in petitioner's case, he followed the same policy in this as in other cases. Judge Ito's practice was to advise defense counsel of his open file policy. He testified that "[d]uring the course of the case, prior to the preliminary hearing, I would ask them if they had everything that they needed." He also customarily sat down with defense counsel and the murder book, going through it page by page to ensure that defense counsel had a copy of everything. Additional information not previously included in the murder book would also be turned over to defense counsel.

**\*\*\*185** As a prosecutor in 1980, Judge Ito was mindful of his *Brady* obligations. He "absolutely" considered the Montez letter to be *Brady* material and could think of no reason why he would not have disclosed it, although without further investigation he did not believe the letter necessarily was a statement by Saucedo. Judge Ito acknowledged that a document like the Montez letter might be temporarily withheld from the defense to allow the prosecution sufficient time to conduct an investigation and to afford protection to the witness.

Following the preliminary hearing, then Prosecutor Horn assumed responsibility for petitioner's cases. Judge Horn has no memory of the Montez letter and did not recall providing any discovery to the defense; he assumed when he took over the cases that all previous discovery obligations had been met.

Immediately after jury selection began, Horn turned responsibility for the Black case over to then Deputy District Attorney Hazell. Hazell also assumed responsibility for the Hosey case. Hazell has no memory of the Montez letter or of providing the defense any discovery. When taking over the cases, he assumed all previous discovery obligations had been met.

**\*\*524** Referee's analysis and findings: first report

The referee filed his first report on June 4, 2002. In it, he stated:

"Petitioner's trial counsel assert that they did not receive, or know about, the Montez letter before the entry of judgment in either case. The trial record in the Black and Hosey cases corroborates this assertion. No portion of the trial record has been identified as indicating that defense counsel were aware of, or were using, the subject matter of the Montez letter in representing petitioner through the entry of judgment in the Black and Hosey cases.

"Respondent offered evidence that the general discovery practices of the prosecutors assigned to the Black and Hosey cases were to provide the defense with all discoverable materials, either by turning over the documents **\*553** or providing access to the prosecution files. However, respondent offered no evidence that anyone involved in the prosecution of the Black and Hosey cases recalls that, prior to entry of judgment in either case, the Montez letter was provided to anyone involved in petitioner's defense. A prosecution discovery transmittal letter and file log were admitted into evidence. These documents did not contain any reference to the Montez letter.

"It would be unreasonable to find that experienced defense counsel, in defending against a charge of murder, were so inadequate in defending petitioner that they:

"a. Failed to review thoroughly the contents of each item of discovery received from the prosecutors and thereby overlooked the Montez letter; or

"b. Were aware of the contents of the Montez letter prior to the entry of judgment and chose not to make some use of it.

**"4. Conclusion**

"In a habeas proceeding, the petitioner bears the burden of proving the allegations by a preponderance of the evidence. *In re Riddle* [ (1962) ] 57

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                    Page 17
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

Cal.2d 848, 852[, 22 Cal.Rptr. 472, 372 P.2d 304].

"In support of the petitioner, the evidence showed that:

"a. The prosecutors lacked any specific recollection of providing the Montez letter to the defense;

"b. There was no document which indicated that the prosecution provided the Montez letter to the defense;

***186 "c. There was no document which indicated that the Montez letter had been logged into the prosecution's file, or had been reviewed by the defense; and

"d. Defense counsel specifically represented that they did not receive the Montez letter prior to the entry of judgment in either case.

"In support of the respondent, the evidence showed that:

"a. The prosecutors had general discovery practices; and

"b. The prosecutors stated that their general practices would provide to the defense a discoverable item, such as the Montez letter.

*554 "Petitioner's evidence preponderates over the respondent's evidence. *In re Pratt* (1999) 69 Cal.App.4th 1294, 1318-1319[, 82 Cal.Rptr.2d 260]. This court finds by a preponderance of the evidence that defense counsel in the Black and Hosey cases did not receive the Montez letter prior to the entry of judgment in either case."

[1][2] Although a referee's findings on factual questions are not binding on us, they are entitled to great weight when, as here, they are supported by substantial evidence. (*In re Johnson* (1998) 18 Cal.4th 447, 461, 75 Cal.Rptr.2d 878, 957 P.2d 299.) Respondent presented testimony concerning the prosecution's general discovery practices, but adduced no evidence-such as a transmittal form, ac-

knowledgment of receipt by petitioner's trial counsel, or a specific recollection on the part of Judge Ito-tending directly to refute petitioner's substantial showing that the Montez letter was never received by the defense. Nor does respondent challenge the referee's finding that trial counsel in the Black and Hosey cases did not receive the Montez letter prior to the entry of judgment **525 in either case. Accordingly, we adopt that finding.

**Exceptions: first report**

[3] Before the hearing, respondent moved for access to trial counsel's file; the referee denied the motion. Respondent takes exception to the referee's denial order. We review the referee's discovery rulings for abuse of discretion. (*In re Scott* (2003) 29 Cal.4th 783, 814, 129 Cal.Rptr.2d 605, 61 P.3d 402.)

The referee found respondent's motion overbroad, in that it extended to irrelevant documents. He ruled instead that respondent could issue a subpoena duces tecum or a request for production from the files of petitioner's trial counsel for documents "relevant to the limited question of whether any of petitioner's trial counsel were in receipt of the Montez letter prior to the entry of judgment in the respective criminal cases, for example: (1) the Montez letter itself or a copy thereof; (2) each writing that contains any reference to the Montez letter; and (3) each writing that indicates that [p]etitioner's trial counsel were in receipt or aware of the Montez letter." The referee directed petitioner to respond to any such request within 20 days of service with "[a]ll requested writings that are not privileged" and "[a] privilege log for requested writings for which a protective privilege is claimed." Respondent issued the subpoena; petitioner replied that the file contained no such information.

Respondent argues that petitioner put in issue the entire contents of his trial counsel's files by alleging counsel never received the Montez letter. Respondent relies in particular on the allegations that "[t]he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                    Page 18
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

Montez letter is not in Joe Ingber's or Alan [sic: Albert] Garber's trial files." Respondent also asserts *555 that by alleging ineffective assistance of trial counsel (for ***187 failing to investigate whether Saucedo killed Hosey) in an earlier habeas corpus petition we summarily denied in 1993, petitioner forever waived any attorney-client privilege regarding counsel's competence. (See Evid.Code, § 958 [no privilege "as to a communication relevant to an issue of breach, by the lawyer or by the client, of a duty arising out of the lawyer-client relationship].) Accordingly, respondent argues, the referee's ruling denying him access to trial counsel's files precluded his testing counsel's testimony about the files' contents against the best evidence in the case, i.e., the files themselves.

[4][5] The referee did not abuse his discretion in denying respondent's motion for access to trial counsel's files. As the referee noted, the motion was overbroad in seeking access to materials having nothing to do with the issues presented in this case. The referee properly permitted respondent to tailor a subpoena duces tecum or request for production of documents seeking only the items potentially relevant to the question presented by our reference order. Moreover, as we have explained, in filing his previous habeas corpus petition alleging ineffective assistance of counsel, petitioner did not *waive* the privilege, he merely triggered an *exception* to it that is not applicable in future proceedings. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 695, 47 Cal.Rptr.3d 326, 140 P.3d 657 [under Evid.Code, § 958, "the attorney-client privilege continues to apply for purposes of retrial after otherwise privileged matters have been disclosed in connection with habeas corpus proceedings"].)

In sum, having been permitted to request production of all conceivably relevant materials in trial counsel's files, respondent has shown no abuse of discretion in the referee's ruling. (*In re Scott, supra,* 29 Cal.4th at p. 814, 129 Cal.Rptr.2d 605, 61 P.3d 402.)

**Evidence presented at the second reference hearing**

Our June 25, 2003, order for a second reference hearing directed Judge Krauel to take evidence and make findings of fact on these additional questions:

"1. (a) Did Larry Montez write and/or sign the document dated October 23, 1980? [¶] (b) If the answer to question (1)(a) is yes, under what circumstances was it written and signed? Would Montez have been available as a witness to the defense? What would he have said? Is the information contained in the document or about which Montez would have testified credible? Could and would the **526 defense have effectively cross-examined Saucedo regarding the information the document contains? [¶] (c) If the answer to question (1)(a) is no, the referee need make no further findings concerning the document unless petitioner contends it is material even if not written or signed by Montez....

*556 "2. What did Saucedo tell Jimmie Barnes, Marvin Sanchez and Steven McDonald about his role in the Hosey killing? Did Saucedo's statements to Barnes, Sanchez and McDonald differ from his testimony in petitioner's trial and, if so, how did they differ? Would disclosure to the defense of information provided to the prosecution by Barnes, Sanchez and McDonald, and the prosecution's arrangements with those individuals, have led to useful defense evidence and, if so, what? Could and would the defense have effectively cross-examined Saucedo regarding the information provided by Barnes, Sanchez and McDonald?

"3. If the undisclosed evidence (the letter and the prosecution's arrangements with Barnes, Sanchez and McDonald) had been disclosed to petitioner, would petitioner's***188 trial counsel in the Hosey murder case have advised him to plead guilty? Would petitioner have entered a guilty plea in that case?"

The evidence considered by the referee in response to our second reference order consisted of factual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                      Page 19
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

stipulations by the parties, written declarations and other documentary evidence (jointly submitted or admitted without objection), and live testimony. The live hearing on the second reference order took place on June 24 and July 22, 2004. More specifically, the evidence included the following.

*Joe Saucedo*

Joe Saucedo's declaration was jointly submitted to the referee. Saucedo (also known as Jose Saucedo, Joseph Saucedo, and "Turtle") declared that he had testified truthfully at petitioner's preliminary hearing and capital trial. Saucedo further declared, as he had testified then, that petitioner chased Robert Hosey and stabbed him, while he (Saucedo) tried to stop the stabbing. Saucedo also declared that a person named "Sam Nobel," whom he knew from jail, had witnessed these things.[FN3]

> FN3. The declaration of Sam Clayton Noble, an inmate at North Kern State Prison, was jointly submitted to the referee. Noble declared that he knew Saucedo and had learned from counsel for petitioner that Saucedo had claimed Noble witnessed the Hosey murder. Noble declared, "he is lying.... I did not witness the murder of Mr. Hosey." Noble also declared that he had neither seen nor spoken with Saucedo since junior high school.

Saucedo's declaration acknowledges that in 1980 or 1981 he was housed in jail with Marvin Sanchez, Jimmy Barnes, Steven McDonald, and Abigail Molina, but states he never told them anything about the murder of Robert Hosey. The parties stipulated that if Saucedo had been called as a witness at the second reference hearing, he would have testified consistently with this account and would have testified, further, that he neither told Larry Montez the information contained in the Montez letter nor asked Steven McDonald to tell authorities that petitioner killed Hosey.

*557 A chronology of the prosecution of Saucedo in relation to the Hosey killing was introduced at the second reference hearing, together with supporting documents from the prosecution's files. As the chronology details, Hosey was murdered on September 12, 1980, approximately two weeks before the murder of Gary Black on September 27. Saucedo was arrested for the Hosey murder on September 19, 1980; on October 3, petitioner was arrested and charged with both the Black and Hosey murders. Saucedo was charged by information with the Hosey murder in January 1981. After petitioner's preliminary hearing in February 1981, petitioner was held to answer on the Black charges, but the Hosey charges were dismissed.

In August 1981, then Deputy District Attorney Ito interviewed Saucedo under oath and on the record before a court reporter. On September 2, Deputy District Attorney Hazell recommended that Saucedo be permitted to plead to the reduced charge of assault with a deadly weapon in the Hosey case, in exchange for which Saucedo would agree to testify against petitioner. In a memo seeking authority to offer Saucedo **527 such a deal, Hazell wrote: "There is insufficient evidence to hold Mr. Miranda in the [Hosey] stabbing without Mr. Saucedo's testimony." A new complaint was filed charging petitioner again with the murder of Hosey, and in November 1981 a preliminary hearing was held at which Saucedo testified as expected. Petitioner thereafter was held ***189 to answer for the murder of Hosey, and the information against Saucedo in the Hosey case was amended to include a count of assault with a deadly weapon. Saucedo subsequently was released on his own recognizance.

Respondent acknowledges that the district attorney requested witness expenses for Saucedo, which were approved. Thereafter, as detailed above, Saucedo testified as a state's witness at the penalty phase of petitioner's capital trial. The following day, Saucedo pleaded guilty to assault with a deadly weapon in the Hosey case, in return for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                   Page 20
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

which he was sentenced to time served in state prison and placed on probation for two years.

*Larry Montez*

Larry Montez's August 30, 2002, declaration was jointly submitted to the referee. In 1980, Montez was in custody and housed in the cell next to Saucedo. Saucedo described to Montez how he had stabbed a Black drug dealer. Montez wrote what Saucedo had told him in a letter (the Montez letter) and notified police about what Saucedo had told him and about the letter. When police detectives talked to him, Montez signed the letter, which "accurately describes what Saucedo told me." After he was released from custody, Montez met with one of the detectives at a restaurant in the City of Wilmington, where he talked further "about Saucedo and his killing of the Black guy." In 1994, Montez found himself again in jail with Saucedo, and *558 he "got to talking with Saucedo because I was cutting his hair. Saucedo told me again that he killed the Black guy and said, 'at least I know I got away with something.' As far as Adam Miranda goes, Saucedo said, 'fuck that guy, he can go eat fish.'"

During the time petitioner and Saucedo were jointly charged with the Hosey murder, Montez was offered a deal by then Deputy District Attorney Ito in exchange for his testimony against Saucedo. On November 20, 1980, Ito wrote a letter to Deputy Los Angeles City Attorney Timothy Hogan confirming a telephone conversation in which Ito had informed Hogan that "Mr. Montez has agreed to testify as a witness for the People at both preliminary hearing and trial for an early release from the County Jail sentence he is serving" on an unrelated matter. Ito's letter also confirmed Hogan's agreement that "given the severity of the murder cases and the materiality of Mr. Montez's information and testimony, [Hogan] would not oppose a request by the District Attorney's Office to modify Mr. Montez's sentence as outlined" in the letter.

Notwithstanding these arrangements, Montez ulti-mately was not asked to testify at any trial. "If Adam Miranda's lawyers had asked me to testify at his trial," he declared, "I would have been willing to testify about what Joe Saucedo told me. I would have testified that Joe Saucedo admitted to me that he killed the Black guy and that what Joe Saucedo told me I wrote down in the [Montez letter]."

*Marvin Sanchez*

Marvin Sanchez's declaration, dated December 15, 2003, was jointly submitted to the referee. Sanchez declared that in 1980 or 1981, he was confined in a Los Angeles County jail unit where Saucedo and petitioner also were confined. Saucedo told Sanchez he had stabbed a Black drug dealer over a bad drug transaction. Saucedo said he had stabbed the dealer multiple times with the dealer's own knife, including in the face and upper torso, and then had thrown the knife onto a riverbank. Saucedo "took full credit for the stabbing" and never told Sanchez that petitioner had participated. Saucedo also told Sanchez ***190 that he (Saucedo) planned to turn "state's evidence" against petitioner, who was going to prison anyway, and thereafter flee to Mexico.

In Sanchez's conversations with petitioner, petitioner denied stabbing the drug dealer. Petitioner told Sanchez he "had a feeling" that Saucedo was going to turn on him and blame him for the stabbing. After speaking **528 with Saucedo and petitioner, Sanchez contacted then Deputy District Attorney Ito. Although Sanchez did not speak directly with Ito, he met approximately three times with Detectives Kotler and Avila, telling them "everything that [Saucedo] had told me about the killing of the [B]lack drug dealer."

*559 After he met with the detectives, Sanchez's case was dismissed and he was placed in the witness protection program. On May 5, 1981, Sanchez was given $150 through the program, and in the following month, then Deputy District Attorney Ito applied to the court to obtain additional funds for him, submitting the declaration of Deputy Sheriff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                     Page 21
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

Gary Kotler in support. In that declaration, Kotler stated: "I have been advised by Deputy District Attorney Lance A. Ito of the Hardcore Gang Division that Marvin Sanchez is a necessary and material witness ... because defendant Joe Saucedo related to Marvin Sanchez the manner in which Penal Code Section 187 victim Hosey was stabbed to death with such unusual particularity as to indicate that the source of the information was intimately involved in the commission of the crime." Sanchez was told by prosecutors that he was going to be held in reserve "in case they needed [him] to testify" against Saucedo. But he was never asked to testify.

If an investigator working for petitioner had spoken to him about Saucedo's confession, Sanchez "definitely would have answered his questions and told the investigator what I knew. But, no one ever came to talk to me about the drug dealer killing after the few times that I spoke to Detectives Kotler and Avila."

*"Jimmie Barnes"*

The declaration dated January 28, 2004, of "Jimmie Barnes" (whose true name is Thomas Porter) was jointly submitted to the referee. Barnes explained that in the early 1980's, he had been housed at Men's Central Jail in Los Angeles along with Saucedo, known to him then as "Turtle." Barnes remembers Saucedo "bragging to me and others that he had killed someone and that it involved the stabbing of a drug dealer. The way Turtle talked about it, I got the impression that Turtle got his stabs in on the drug dealer." Barnes told police detectives about Saucedo's statements and was moved to a medical unit in the jail. He was told that if he agreed to testify against Saucedo, he would be released on his own recognizance and kidnapping charges pending against him would be dismissed. Barnes agreed and was released. Subsequently, he discussed with Deputy District Attorneys Ito and Hazell the deal he had made with the detectives.

Barnes never met or spoke with petitioner. If he had been interviewed by defense counsel at the time, he would have given them the same information he gave to police detectives and Deputy District Attorneys Ito and Hazell.

*Steven McDonald*

The declaration of Steven Wayne McDonald, dated December 15, 2003, was jointly submitted to the referee. In 1980 or 1981, McDonald was **560** incarcerated in the Men's Central Jail in Los Angeles. While housed in the "snitch" unit there, McDonald encountered Saucedo (known to him as "Turtle"), who was housed there ***191** also. At some point, Saucedo confessed to McDonald that he had stabbed and killed a drug dealer over a deal that "went bad." Saucedo said he stabbed the man many times in the upper body and demonstrated how the man's upper body and arms shook as he was stabbed. Saucedo said he continued to stab the man even after the man's whole body was shaking violently.

Subsequently, Saucedo told McDonald that the latter should "lie for him" and say that another inmate (whose name McDonald could not recall) had actually killed the drug dealer. Saucedo threatened to kill McDonald or have other Mexican inmates kill him if McDonald did not help him. Saucedo also said that if McDonald did not cooperate, the "Mexican Mafia" would kill McDonald's family. McDonald felt he had no choice but to cooperate.

For a week, Saucedo coached McDonald on how to answer the detectives' questions about "how the stabbing went down." Saucedo said the story would be more credible "coming from a [W]hite person" with a clean criminal history instead of someone who was **529** a Mexican. Pursuant to Saucedo's instructions, McDonald then contacted a Deputy Sweeny, a guard in the snitch unit who set up a meeting with three detectives whose names McDonald could not remember.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                          Page 22
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

During that first meeting, McDonald told the detectives the lies Saucedo had instructed him to tell (viz., about another unnamed inmate confessing to the murder of the drug dealer). At a second meeting, where Saucedo was present, Saucedo told the detectives that the same inmate had confessed to him about the murder of the drug dealer. At a third and final meeting, at which only two of the detectives were present, McDonald was told "if I cooperated they would let me go." Thereafter, McDonald was moved, "for my protection," to the Lynwood substation, and two months later he was released. Before being released, McDonald gave detectives his contact information, including the address at which he lived for a year after his release, but no one contacted him.

If in 1980 or 1981 a defense investigator had contacted him and given him assurances of protection, McDonald would have told the investigator what Saucedo had said to him.

### Abigail Molina

Although our second reference order did not specifically request it, the declaration of Abigail Bobby Molina, dated August 27, 2003, was jointly *561 submitted to the referee. In the early 1980's, Molina was housed in the Los Angeles County jail's "snitch unit," along with Saucedo and Montez. Saucedo told Molina and Montez that he (Saucedo) had killed and stabbed a drug dealer and was facing murder charges. Saucedo told Molina how the murder took place and that it felt like "cutting through butter" when he stabbed the drug dealer. Saucedo asked Molina to write a letter to Molina's sister "telling her that Saucedo was with her on the night of the murder." Molina wrote and sent the letter as requested.

### Petitioner's counsel

### H. Clay Jacke, Sr.

The declaration of H. Clay Jacke, Sr., trial cocoun-

sel for petitioner in the Black case, dated September 5, 2001, and a supplemental declaration dated June 11, 2004, were jointly submitted to the referee. Jacke also gave live testimony.

If when Jacke was involved with petitioner's trial he had received the Montez letter or learned of the information contained in the Montez declaration, he would have interviewed Montez and then used the letter and any information obtained to ***192 rebut Saucedo's testimony in the penalty phase. Had Jacke possessed the Montez letter, the prosecution would not have been able to close its penalty phase presentation with the argument that the defense would have presented evidence that Saucedo committed the Hosey murder if it existed; as it actually occurred, however, the presentation of Saucedo's testimony at the penalty phase had been "devastating" to the defense.

According to Jacke, if the defense team had had Montez's information at trial, their strategy would have been "a full blown attack on Saucedo," contending that Saucedo was Hosey's killer. The defense would have cross-examined Saucedo and, if he denied killing Hosey, called Montez to the stand to show that Saucedo was lying. Moreover, if the defense had learned of the information contained in the declarations of Sanchez, Barnes, and McDonald, it would have interviewed those witnesses, cross-examined Saucedo based on those interviews, and called those witnesses to the stand to impeach Saucedo if he denied killing Hosey. Had Sanchez's, Barnes's, and Montez's credibility been attacked, the defense would have shown that the prosecution itself had made special arrangements with these persons in consequence of their having stated that Saucedo confessed to killing Hosey. In Jacke's view, these arrangements demonstrated that the prosecution believed these witnesses' statements and that they would have made good witnesses against Saucedo. With full information, Jacke thought, the defense would have been able "to destroy Mr. Saucedo as a penalty phase witness" in the Black trial.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                          Page 23
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

*562 Joe Ingber

The November 4, 1996, declaration of Joe Ingber, petitioner's lead trial counsel in the **530 Black case, was jointly submitted to the referee. Ingber also gave direct testimony at the second reference hearing.

According to Ingber, in the course of representing petitioner he never received the Montez letter or any information concerning Montez, Sanchez, Barnes, or McDonald. Had Ingber possessed the Montez letter and the information in Montez's declaration at the time of petitioner's trial, he would have cross-examined Saucedo in detailed fashion about the letter and its contents, which he believed would have caused the jurors to question Saucedo's credibility as the primary aggravation witness at the penalty phase of petitioner's trial. Had he known that Saucedo had received funds from the prosecution, he also would have cross-examined Saucedo regarding his motivation to make a deal and testify against petitioner and would have used Saucedo's arrangements with the prosecution to argue against petitioner's receiving the death penalty.

Had Ingber been provided with information about persons to whom Saucedo had said things similar to things he had said to Montez, he would have interviewed those persons and would have attempted to call them to the stand to the extent he determined their testimony to be of value. In particular, had he been aware of the information known to Jimmie Barnes he would have called Barnes to the stand to impeach Saucedo and would have brought before the jury the fact Barnes had been released from custody owing to information he provided about the Hosey murder. Barnes and Montez would have corroborated one another, in Ingber's view, and cross-examination of Saucedo based on Barnes's information would have been effective.

Had Saucedo denied on the stand that he told Sanchez he had stabbed Hosey, the defense, according to Ingber, could have used Sanchez's testimony to impeach Saucedo. The defense also could have

pointed ***193 out that in return for the information Sanchez gave law enforcement, certain criminal charges against him had been dropped and he was relocated at taxpayer expense. In Ingber's opinion, the jurors would have viewed Saucedo's testimony with "extreme caution" after hearing Sanchez's testimony.

Ingber further opined that if he had been aware of McDonald's declaration at the time he would have attempted to locate and corroborate McDonald's testimony and use it to impeach Saucedo. As McDonald's statements corroborated those of other witnesses, Ingber believed the resulting cross-examination of Saucedo would have been effective.

*563 Albert Garber

The March 27, 1997, declaration of Albert Garber, petitioner's appointed trial counsel in the Hosey case, was jointly submitted to the referee. Garber also testified in person. At the hearing, Garber stated that his memory of representing petitioner in connection with the Hosey murder was "not too good, but I certainly remember the document [i.e., his declaration] that I signed in 1997."

Prior to petitioner's pleading in the Hosey matter, Garber reviewed the discovery provided by the prosecution, as well as the testimony and evidence that had been presented in the Black trial. He was aware that Joe Saucedo was the only witness to identify petitioner as Hosey's killer, and he knew Saucedo was the central prosecution witness concerning the Hosey murder.

During his representation of petitioner, Garber never saw the Montez letter or any documents or information concerning Montez, Sanchez, Barnes, or McDonald and the various arrangements with and payments to these individuals made by law enforcement. The first time Garber saw such documents was in March 1997, when petitioner's federal habeas corpus counsel brought them to his attention. As counsel for petitioner, Garber was familiar

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                         Page 24
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6622
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

with the discovery provided in the Hosey case, and if any of the documents in question had been disclosed to him, he would either have kept a copy or recalled having seen it. None of the documents, however, appear in petitioner's file, which Garber has kept under his custody and control since representing petitioner.

Nor are the documents of the type Garber would forget. In Garber's view, they are "critical" and of "such importance that they **531 would have drastically changed the strategy and tactics of this case." Having reviewed the Montez letter and the other documents attached to his declaration, Garber could say " without a doubt that had I been given the attached documents I would not have advised [petitioner] to plead guilty and I would not have concurred in the plea. However, because this evidence was not provided and I was unaware of it, I advised [petitioner] to plead guilty and I concurred in the plea."

In Garber's view, "Saucedo could never have withstood cross-examination" based upon the Montez letter, the documents concerning payments made to Saucedo, the evidence concerning deals made with other individuals to pressure Saucedo to testify against petitioner, and other impeaching evidence. Given the "explosive impact" of the evidence attached to his declaration, Garber "never would have advised [petitioner] to plead guilty" to the Hosey killing.

*564 *Francis Bardsley*

Francis Bardsley, a criminal defense practitioner who formerly had been employed by the Los Angeles County Public Defender's Office in positions involving the supervision of trial attorneys, and who ***194 served as the first Public Defender of San Diego County, testified as an expert on behalf of petitioner. Bardsley's May 18, 2004, declaration was jointly submitted to the referee, and he testified in person.

After reviewing numerous documents related to this case, Bardsley opined that the testimony of Joe Saucedo played "the central role" in the penalty phase of petitioner's capital trial. He further opined that the information contained in the Montez letter relates to the most important issues in petitioner's case and that the information in the letter impeaching Saucedo is extremely credible. Disclosure to petitioner's defense team of the information provided to the prosecution by Jimmie Barnes and the prosecution's arrangements with him, Bardsley opined, would have led the defense to useful evidence, and the defense could and would have effectively cross-examined Saucedo regarding Barnes's information. Bardsley opined similarly concerning disclosure to the defense of the information provided to the prosecution by Marvin Sanchez and the prosecution's arrangements with him. Disclosure of the information provided by Steven McDonald would also have led the defense to useful evidence.

In sum, Bardsley opined: "The combination of Saucedo's central role, the importance of the information contained in the Montez letter, and the credibility of the information contained in the Montez letter demonstrates that the defense would have effectively cross-examined Saucedo with such information. The impact from the information contained in the Montez letter would have dramatically undermined the jury's confidence in Saucedo's credibility. The cross-examination would have effectively eliminated the jury's ability to rely upon anything Saucedo said. The contradiction between Saucedo's penalty phase testimony and the admission of evidence contained in the Montez letter is stark, palpable and undeniable." "The defense would have been able to cross-examine Saucedo regarding his knowledge of the[ ] deals and arrangements made by the prosecution with [Montez, Barnes, and Sanchez]. Independently of such deals, however, Saucedo obviously was aware of his statements and confessions to at least five separate individuals. Moreover, in order for the prosecution to have discharged its obligations under the rules of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                    Page 25
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

discovery and its constitutional obligations ... the prosecution would have had to have informed Saucedo of these witnesses' statements against him and the deals the prosecution had made with them. Pursuant to these three deals, the prosecution had gathered more than enough witnesses to seal Saucedo's fate at trial. The defense could have effectively *565 argued that Saucedo had only one way out-to lie, cut a deal with the prosecution and pin the crime on [p]etitioner."

On cross-examination, Bardsley acknowledged he had tried cases in which the prosecution presented testimony from jailhouse informants who received benefits in return for testifying. He also acknowledged the prosecution at petitioner's penalty phase trial had urged petitioner's lack of remorse and argued factors in aggravation based on guilt **532 phase evidence, in addition to the Hosey murder evidence. But according to Bardsley, in 1982 capital juries in the Central District of the Los Angeles County Superior Court were almost always returning life verdicts on single robbery homicides and death verdicts only in multiple homicide cases.

*Petitioner's declaration*

Petitioner's testimony at the second reference hearing was presented by his declaration and was limited to his answer to the question whether he would have pleaded***195 guilty to the Hosey murder if he had been privy to the undisclosed information at issue. Petitioner declared that if the Montez letter and the prosecution's arrangements with Barnes, Sanchez, and McDonald had been disclosed to him, he would not have entered a guilty plea in the Hosey murder case.

**Referee's analysis and findings: second report**
Judge Krauel issued "Referee's Partial Rulings" dated July 9, 2004, stating findings in response to parts 1 and 2 of our second reference order (see 76 Cal.Rptr.3d at pp. 187-188, 182 P.3d at 525-526,*ante* ) and filed his complete report, en-

titled "Referee's Report of Proceedings," on August 20, 2004. At its outset, the referee's second report summarizes the referee's findings as follows.

*"The Murder of Black-Death Penalty Case.*

"In *People v. Miranda,* Los Angeles County Superior Court Case No. 362964, Central Division, Adam Miranda ("Miranda" hereinafter) was found guilty of murdering Gary Black during a store robbery. Miranda's Habeas Corpus Petition concerns, in part, the evidence to rebut the testimony of a prosecution witness, Joseph Saucedo ("Saucedo" hereinafter), given during the penalty phase of that trial.

"Among the various contentions made as to why the jury should recommend the death penalty, the prosecution submitted evidence and argument that Miranda had committed another murder. The prosecution called Saucedo *566 to testify that he had witnessed Miranda murder Robert Hosey ("Hosey" hereinafter) by stabbing him numerous times.

"In arguing for the death penalty, the prosecution told the jury that had there been any evidence that it was really Saucedo who killed Hosey, the defense would have presented it. 'It wasn't [presented] because it doesn't exist.'...

"The Referee finds that the rebuttal evidence did exist; it was in the possession of the prosecution before the commencement of the penalty phase of the trial, and it was not disclosed to the defense. The rebuttal evidence that pointed to Saucedo killing Hosey included:

"Larry Montez's ("Montez" hereinafter) statement to police that Saucedo had confessed to killing Hosey.

"Montez's letter, written to the District Attorney, in which Montez recounts the contents of Saucedo's confession to the Hosey murder.

"The prosecution's arrangement with Montez to secure his future testimony to convict Saucedo of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                      Page 26
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

murdering Hosey.

"Jimmie Barnes's (whose true name is Porter) statement to police that Saucedo had confessed to killing Hosey.

"The prosecution's arrangement with Jimmie Barnes to secure his future testimony to convict Saucedo of murdering Hosey.

"Marvin Sanchez's statement to police that Saucedo had confessed to killing Hosey.

"The prosecution's arrangement with Marvin Sanchez to secure his future testimony to convict Saucedo of murdering Hosey.

"Miranda's expert, Francis Bardsley, testified before this Referee that, at the time that the penalty phase of the trial was conducted for the Black murder, juries in the central division of the Los Angeles Superior Court were generally not recommending the death penalty in a case involving a single incident of murder committed during a store robbery. However, juries were recommending the death penalty***196 when it was shown that the defendant had committed another murder at some other time. Bardsley's opinion was not refuted.

**\*\*533** "Thus, this Referee finds that the defense would have used the undisclosed rebuttal evidence to effectively cross-examine Saucedo, impeaching him on a \*567 matter that was of major significance concerning whether the jury would recommend life in prison or the death penalty.

*"The Murder of Hosey-Second Degree Murder Plea.*

"In *People v. Miranda,* Los Angeles County Superior Court Case No. [372157], Central Division, Miranda pled guilty to the second degree murder of Robert Hosey.

"The Referee finds that if the undisclosed evidence had been disclosed to petitioner, petitioner's trial

counsel in the Hosey murder case would have advised petitioner not to plead guilty and petitioner would not have entered a guilty plea."

Following this summary, the referee's second report describes in more detail the referee's findings and the testimony and documentary evidence on which they are based. Among other things, the referee's second report states and supports the referee's findings that: "Larry Montez did write and sign the document dated October 23, 1980, (hereinafter the 'Montez Letter')"; that "Montez was incarcerated in Los Angeles when he wrote the Montez Letter" and "[a]t that time, Saucedo was housed in a cell adjacent to Montez"; that "Montez signed the letter either in the interview cell while being interviewed by detectives or at a restaurant after his interview with the detectives"; and that "the information contained in the Montez Letter is credible...."

The referee's second report also states that: "In describing Saucedo's statements, each person's current description is consistent with the description that that person gave the District Attorney twenty years ago. At this point, there is no apparent reason for any of those persons to lie.... [¶] Further, the prosecution had sufficient belief in the credibility of the 'valuable and essential information' contained in the Montez Letter about Saucedo's confession to and description of the Hosey killing that the prosecution entered into an arrangement with Montez. To secure Montez's future testimony to convict Saucedo of murdering Hosey, the prosecution arranged for Montez to be released early on a jail sentence he was then serving.... [¶] Finally, the credibility of Saucedo's denial of making the confessions to the Hosey killing is suspect...."

Additionally, the referee's second report details what Saucedo told Barnes, Sanchez, and McDonald about his role in the Hosey killing and finds that disclosure to the defense of information provided to the prosecution by \*568 Barnes and Sanchez FN4 would have led to useful defense evidence. The second report finds disclosure of McDonald's information would not have been useful to the de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                    Page 27
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

fense since the "untruthful information" the prosecution possessed at that time "does not implicate Saucedo."

> FN4. In apparent typographical errors, the referee's second report twice refers to "Barnes" in the section labeled as, and devoted to, its discussion of information provided by Sanchez.

**Exceptions: second report**

Nothing in the referee's second report undermines the findings the referee made in his first report. Moreover, but for the finding that disclosure of McDonald's information would not have led the defense to useful evidence, the referee found in ***197 petitioner's favor on all of the additional questions we posed for the second reference hearing.

As noted, the referee's second report finds that in addition to the Montez letter, the prosecution possessed but did not disclose evidence concerning Montez's statement to police that Saucedo had confessed to killing Hosey, the prosecution's arrangements with Montez to secure his future testimony against Saucedo, Barnes's statement to police that Saucedo had confessed to killing Hosey, the prosecution's arrangements with Barnes to secure his future testimony to convict Saucedo of murdering Hosey, Sanchez's statement to police that Saucedo had confessed to killing Hosey, and the prosecution's arrangements with Sanchez to secure his future testimony to convict Saucedo. Respondent does not dispute that these items existed or that the prosecution withheld them **534 from the defense notwithstanding they were "mainly favorable" to petitioner.

Respondent takes exception, however, to some portions of the referee's second report. Generally, respondent disagrees with the referee's findings concerning the impact the undisclosed evidence would have had if timely disclosed to the defense.

[6] First, respondent takes exception to the referee's statement that "the prosecution told the jury that had there been any evidence that it was really Saucedo who killed Hosey, the defense would have presented it." In respondent's view, the referee's "interpretation of the prosecutor's closing is incorrect" because it "takes the prosecutor's argument out of context."

In closing, the prosecutor argued to the penalty phase jury: "Finally, I think you can decide that if there were other people out there who were friends of [petitioner] who really knew that Joe [Saucedo] did it, because Joe was there, and since he has eliminated himself from the neighborhood and disappeared *569 and become a rat, those people could have certainly been brought forward by the defense just as anyone could have been called from out of court to tell you some factors in mitigation about this man. The subpoena power of the county marshal and sheriff works for the defense as well as it does for us. They can say 'please go do this,' and that subpoena would be served. They can say 'appoint us an investigator' and that would be done, as it has been. It wasn't because it doesn't exist." Respondent argues that the prosecutor's assertion "it doesn't exist" was "specifically directed to the lack of evidence of *people from the neighborhood* " who knew petitioner and Saucedo and presumably could have, but did not, come forward, and "did not apply" so as to suggest there was any lack of evidence from other quarters that Saucedo committed the crime. That is, according to respondent, the prosecutor's assertion "it doesn't exist" was not meant to encompass the evidence that did exist-evidence the prosecution possessed from its informants Montez, Sanchez, Barnes, and McDonald-none of whom, respondent states, were " acquainted with petitioner or from petitioner's neighborhood."

We conclude the referee did not significantly mischaracterize the prosecutor's closing argument. It seems unlikely the jury would have understood the word "it" in the prosecutor's comment "it doesn't exist" to refer only to evidence coming from people

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                 Page 28
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

who lived in petitioner's neighborhood, rather than evidence concerning Saucedo generally. While the prosecutor mentioned that Saucedo was "from the neighborhood," he also remarked, broadly, that "anyone could have been called from out of court to tell you some factors in mitigation" and the "subpoena power of the county marshal and ***198 sheriff works for the defense as well as it does for us."

[7] Second, respondent takes exception to the referee's findings that the information contained in the Montez letter was credible, "to the extent the Referee relies on jailhouse informant McDonald." As respondent points out, McDonald admits he lied to detectives "20 years ago when he told them that an inmate "whose name I cannot recall" (someone other than Saucedo) had confessed to the Hosey killing.

McDonald's declaration was only one of many evidentiary sources for the referee's findings. As the referee observed, Saucedo's confession to Montez is corroborated by evidence from several other persons who each related that Saucedo confessed to them. "In describing Saucedo's statements, each person's current description is consistent with the description that that person gave the District Attorney twenty years ago. At this point, there is no apparent reason for any of those persons to lie." Moreover, the record contains substantial evidence to support crediting McDonald's current declaration over his former statements. McDonald's declaration explains that, in fact, it was Saucedo who confessed in detail to the Hosey killing and that *570 Saucedo told McDonald that if McDonald did not help him by lying to the detectives, "he would kill me or that other Mexican inmates would kill me. [Saucedo] also said that if I did not cooperate, the Mexican Mafia would kill my family. I felt I had no choice but to cooperate with [Saucedo]." McDonald having thus provided an **535 explanation for his contrary statements 20 years ago, and numerous other persons having provided similar corroborating testimony, the referee had substantial grounds for crediting McDonald's current testimony along with other evidence in finding Montez's evidence credible.

[8] Third, respondent takes exception to the referee's findings that the defense could have effectively cross-examined Saucedo regarding the information contained in the Montez letter and provided by Barnes and Sanchez, pointing out that Saucedo presumably would have denied confessing to anyone. But as petitioner argues, the weight of the evidence would have been against such denial.

Nor does the fact Saucedo actually was impeached at petitioner's trial suggest that cross-examination of him based on the undisclosed witnesses' testimony would have had no independent or additional effect.[FN5] As petitioner points out, nothing that was actually presented at trial came close to presenting an equivalent picture of Saucedo's involvement in the Hosey killing.

> FN5. At the penalty trial, Saucedo admitted he had initially lied to police about his presence at and involvement in the Hosey killing, and that he ultimately had pleaded guilty to a charge of assault with a deadly weapon in connection with those events.

The prosecution, as the referee stated, "presented Saucedo to the jury for a single purpose, i.e., to testify that [petitioner] stabbed and killed Hosey." Contrary to respondent's suggestion that "the jury was presented with a fair picture of [Saucedo's] credibility," the prosecution painted Saucedo merely as "a person who aided and abetted in this killing," while petitioner was touted as "the man who was willing to do it." Saucedo denied having stabbed Hosey and painted himself as the Good Samaritan trying to stop the killing. As petitioner's trial counsel testified, disclosure of the persons to whom Saucedo had confessed "would have allowed [the defense] to destroy Mr. Saucedo as a penalty phase witness. This evidence would have shown that Mr. Saucedo told at least five other people, all independent witnesses unknown***199 to each other, that he, not [petitioner], had killed Hosey."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                           Page 29
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

Fourth, respondent takes exception to the referee's findings about what Saucedo told Barnes, Sanchez, and MacDonald about his role in the Hosey killing, "to the extent the referee fails to take into account that Saucedo denied making a confession" at all. The record, however, reflects that the referee considered Saucedo's testimony and rejected it.

*571 Fifth, respondent takes exception to the referee's findings that Saucedo's statements to Barnes, Sanchez, and McDonald differed from his testimony at petitioner's trial but, again, only "to the extent that Saucedo denied ever making a confession" and "asserts he told the truth when he testified at trial." The exception is not well taken. As has been discussed, the referee considered Saucedo's testimony, found it not credible, and rejected it in favor of other record evidence.

[9] Sixth, respondent takes exception to the referee's findings that the disclosure to the defense of information provided by Barnes and Sanchez would have led to useful defense evidence. Respondent's argument is difficult to fathom, as respondent concedes disclosure would have led the defense to Barnes and Sanchez, both of whom, of course, have declared they would have testified that Saucedo confessed to them that he (Saucedo), not petitioner, had killed Hosey. That Barnes and Sanchez, like the prosecution's star witness Saucedo, were jailhouse informants, while perhaps diminishing the value of their evidence to the defense, hardly would have rendered it *useless,* as respondent asserts.

[10] Seventh, respondent takes exception to the referee's finding that disclosure to the defense of information concerning the prosecution's bargains with Barnes, Sanchez, and others for their agreement to testify that Saucedo had admitted killing Hosey would have led to useful defense evidence. The referee found the defense would have used such information to argue that the prosecution lacked a good faith belief that Saucedo was truthfully describing petitioner's involvement in that killing. Respondent asserts the **536 referee failed to consider that Saucedo, himself, had received a

deal from the prosecution after Barnes and Sanchez were given their deals, indicating, according to respondent, that "it was Saucedo the prosecution ultimately believed was truthful."

The record demonstrates that the referee was well aware of the dates and details of the prosecution's various contacts and arrangements with Saucedo. "We have no reason to assume the referee failed to consider any significant fact." (*In re Ross* (1995) 10 Cal.4th 184, 202, 40 Cal.Rptr.2d 544, 892 P.2d 1287.) Respondent's speculation concerning why the prosecution ultimately chose to deal with Saucedo is beside the point, as even if accurate it does not demonstrate the defense would have found evidence concerning the various deals useless. The referee, moreover, made no finding concerning the prosecution's beliefs; his findings on the point related only to how the defense would have used the undisclosed information at trial.

[11] Eighth, respondent takes exception to the referee's findings that had petitioner's trial counsel in the Hosey case possessed the undisclosed evidence, he would have advised petitioner not to plead guilty to the Hosey *572 murder and that petitioner would not have so pleaded. While respondent does not attack the accuracy of these findings per se, he contends the referee inappropriately limited the scope of respondent's cross-examination of petitioner and counsel on this point.

Before Attorney Garber and petitioner gave their evidence, the parties presented ***200 arguments to the referee concerning the scope of the third part of our second reference order. That part read: "If the undisclosed evidence (the letter and the prosecution's arrangements with Barnes, Sanchez and McDonald) had been disclosed to petitioner, would petitioner's trial counsel in the Hosey murder case have advised him to plead guilty? Would petitioner have entered a guilty plea in that case?" Petitioner argued that in the context of the second reference order as a whole, and in light of concerns about the attorney-client privilege and the work product doctrine, petitioner and Garber should be asked the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                Page 30
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

precise questions posed in our order and further examination limited. Respondent disagreed, noting a desire to "delve into what went into [Garber's] decision-making process before advising petitioner to plead guilty" in order that the referee might better "judge the credibility of Mr. Garber and Mr. Miranda." In ruling on the scope of examination, the referee began by observing that in the first two parts of our second reference order, we posed "particularized follow up, background, circumstantial sorts of questions" while the questions in part 3 call "for a yes or no answer." Accordingly, the referee ruled, "I believe and find that the questions posed in part 3 are dependent upon the answers that we have reached in parts 1 and 2 and the [July 9, 2004, partial] findings that I have made, and I believe it's a yes or no response [to the questions in part 3] and will limit the hearing to that." Later, the referee modified this ruling by allowing for "appropriate" followup questions. Such questions, the referee indicated, would relate to trial counsel's "ability to remember and perceive"-having "the scope of does he remember the case, does he remember the parties, does he remember talking to so and so" but would not "get into the credibility of the informants and the credibility of the plea arrangements or deals" covered by parts 1 and 2 of our second reference order. Detailed examination concerning counsel's and petitioner's thought processes and discussion, the referee opined, "goes beyond the scope of question 3."

Ultimately, respondent was permitted to cross-examine Garber concerning his memory of representing petitioner in the Hosey murder case. But when respondent attempted to delve further into the basis for Garber's assertion he would have advised petitioner not to plead guilty, the referee sustained petitioner's objection.

After Garber testified, the referee obtained the parties' agreement that petitioner's response to the question whether, in light of the referee's July 9, *573 2004, partial findings, he would have pleaded guilty to the Hosey murder, would be obtained by

way of declaration. Respondent acceded to this procedure only after renewing an objection to the court's earlier ruling limiting the scope of cross-examination.

**537 The referee was correct that the specific question our reference order posed-whether petitioner's counsel would have advised petitioner to plead guilty if he had been apprised of the undisclosed evidence-called for a yes-or-no answer. Nevertheless, respondent should have been allowed to test the credibility of counsel's assertion by asking him why he would have advised against a guilty plea. If counsel had been unable to supply a good explanation, his inability might have cast doubt on the credibility of his response.

[12] Any error in this regard, however, was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) The evidence withheld in this case was sufficiently strong that its nondisclosure significantly altered the dynamics of petitioner's prosecution. Under the circumstances, we ***201 find it credible that a competent attorney in possession of the undisclosed evidence would have advised against a guilty plea to murder.

[13] Finally, respondent takes exception to the referee's not having admitted into evidence the transcript of Charles Bates's statement to the Los Angeles County District Attorney. Bates was an inmate in custody near petitioner at Parker Center in Los Angeles County who stated to prosecutors in 1980 that he had heard petitioner state that he had "stabbed a Black guy" while Saucedo held the guy down. Notwithstanding that our second reference order did not ask anything about Bates, respondent moved in limine before the second hearing to admit Bates's statement, arguing it was relevant to our questions concerning whether disclosure to the defense of information provided by Montez, Barnes, Sanchez, and McDonald would have led to useful defense evidence. The referee denied respondent's motion and made no finding concerning Bates.

At the hearing, respondent argued Bates's statement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                   Page 31
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

was relevant because, "if petitioner's counsel had presented Montez, Sanchez, Barnes, McDonald, and Molina on rebuttal, the prosecution would have presented the testimony of Mr. Bates. If Mr. Bates took the stand and denied the statements, he would have been impeached with a prior inconsistent statement." As respondent puts the point now: "In determining what constitutes 'useful' evidence, it is submitted that one must review not only what the defense evidence was, but also what evidence, if any, could be introduced to rebut that defense evidence. In other words, defense evidence is not 'useful' if it could be impeached or rebutted so as to provide no advantage if presented."

*574 The major premise of respondent's exception- that "if petitioner's counsel had presented Montez, Sanchez, Barnes, McDonald, and Molina on rebuttal, the prosecution would have presented the testimony of Mr. Bates"-appears implausible in light of the record, which includes most obviously the fact the prosecution did *not* call Bates to testify at petitioner's capital trial, as well as a note to the file written by then Deputy District Attorney Ito indicating that Bates had lied to prosecutors. Respondent's other premise-that defense evidence is not useful if it could be impeached-seems beside the point, as even if respondent's speculation that the prosecution might have called Bates to rebut Montez, Sanchez, Barnes, McDonald, and Molina is accurate, respondent fails to demonstrate that the undisclosed evidence concerning those persons would have afforded the defense "no advantage" in the face of Bates's statement. Evidence obviously may be useful to a party even if it could be impeached or rebutted.

[14][15][16] In any event, Bates's statement was inadmissible hearsay. " 'A reference hearing following issuance of an order to show cause is subject to the rules of evidence as codified in the Evidence Code. (See Evid.Code, § 300.) Under those rules, an out-of-court declaration is hearsay, and unless subject to some exception permitting it to be admitted, should be excluded upon timely and proper ob-

jection.' " (*In re Scott, supra,* 29 Cal.4th at pp. 822-823, 129 Cal.Rptr.2d 605, 61 P.3d 402.) Unlike the declarations included in the exhibits to the parties' joint submission and the others admitted into evidence by stipulation of the parties, the parties did not agree to the admission of Bates's statement. To the contrary, petitioner objected to admission of Bates's statement on hearsay grounds.

**538 Respondent did not respond to the hearsay objection at the hearing nor does respondent presently dispute the objection's validity. Respondent asserts that if the ***202 referee had determined Bates's evidence was relevant but hearsay, respondent "would have attempted to present Bates in person," but even if credited that assertion does not demonstrate the referee abused his discretion in excluding Bates's statement. As petitioner pointed out at the hearing, Bates was a "surprise witness," in that respondent had not sought to include his statement when the parties were compiling their joint submission to our second reference order.

In sum, respondent's exceptions to the factual findings contained in the referee's second report are not persuasive. Respondent neither disputes the existence and nondisclosure of the various items of evidence we asked the referee to inquire about, nor demonstrates that the referee lacked substantial evidence for his conclusions respecting their potential usefulness to the defense. As previously noted, in such circumstances the referee's findings are entitled to great weight. (*In re Johnson, supra,* 18 Cal.4th at p. 461, 75 Cal.Rptr.2d 878, 957 P.2d 299.)

*575 DISCUSSION

[17][18] The procedural law applicable in this case may be summarized as follows. When a prisoner collaterally attacks a judgment by petition for writ of habeas corpus, he or she bears the burden of alleging and proving, by a preponderance of the evidence, the facts supporting his or her claim for relief. (*In re Sassounian* (1995) 9 Cal.4th 535, 546, 37

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                    Page 32
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

Cal.Rptr.2d 446, 887 P.2d 527; *People v. Duvall* (1995) 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252.) In issuing an order to show cause in a habeas corpus proceeding, a court makes " 'an implicit preliminary determination' " as to claims within the order that the petitioner " 'has made a sufficient prima facie statement of specific facts which, if established, entitle him to ... relief....' "(*Sassounian*, at p. 547, 37 Cal.Rptr.2d 446, 887 P.2d 527, quoting *In re Hochberg* (1970) 2 Cal.3d 870, 875, fn. 4, 87 Cal.Rptr. 681, 471 P.2d 1.)

[19][20][21][22] The substantive law governing this case may be summarized as follows. The prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence to a criminal defendant when the evidence is both favorable to the defendant and material on either guilt or punishment. (*In re Sassounian, supra,* 9 Cal.4th at p. 543, 37 Cal.Rptr.2d 446, 887 P.2d 527, citing *United States v. Bagley* (1985) 473 U.S. 667, 674-678, 105 S.Ct. 3375, 87 L.Ed.2d 481; see also *Brady, supra,* 373 U.S. at p. 87, 83 S.Ct. 1194.) "Evidence is 'favorable' if it ... helps the defense or hurts the prosecution, as by impeaching one of the prosecution's witnesses." (*Sassounian*, at p. 544, 37 Cal.Rptr.2d 446, 887 P.2d 527.) "Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result ... would have been different.' " (*Ibid.;* accord, *Kyles v. Whitley* (1995) 514 U.S. 419, 433-434, 115 S.Ct. 1555, 131 L.Ed.2d 490.) Such a probability exists when the undisclosed evidence reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict. (*Kyles,* at p. 434, 115 S.Ct. 1555; *In re Brown* (1998) 17 Cal.4th 873, 886-887, 72 Cal.Rptr.2d 698, 952 P.2d 715.)

After two reference hearings, the referee, as has been detailed, concluded the prosecution possessed but did not timely disclose to the defense several items of evidence that tended to rebut the testimony of the prosecution's star penalty phase witness, Joe Saucedo, and that contradicted the prosecutor's sug-

gestion in his penalty phase closing argument that evidence indicating it was really Saucedo who killed Hosey "didn't exist."

***203 The Montez letter**

The referee found that Larry Montez wrote and signed the Montez letter and that the information contained in the letter is credible in two respects-*576 "it is credible that Saucedo told Montez that he had killed Hosey, as Montez reported in the Montez letter [and] Saucedo's confession to the Hosey murder is credible."

[23][24] The Montez letter satisfies all the *Brady* requirements. (See **539*Brady, supra,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.) Clearly it is favorable to petitioner, involving as it does the primary penalty phase witness's detailed admissions, inconsistent with his trial testimony inculpating petitioner, of the witness's own actions in killing Robert Hosey, destroying evidence, and developing a false alibi to deflect suspicion. It also is material. As the referee found, counsel could have used the letter to effectively impeach Saucedo's testimony on cross-examination, to investigate and present evidence of Saucedo's guilt, and to obviate or refute the trial prosecutor's closing argument urging the jury to believe that if evidence existed that Saucedo had killed Hosey, the defense would have presented it. Had it been provided, Montez would have been available as a witness to the defense and would have testified in the penalty phase of petitioner's capital trial, credibly and in conformity with what he asserted in the Montez letter.

Respondent does not deny that had they been properly placed before the jury, Saucedo's admissions would have met the *Brady* materiality standard. Respondent argues, rather, that the Montez letter was not material within the ambit of *Brady* because it was inadmissible hearsay. (Evid.Code, § 1200.) In this connection, respondent misquotes *Wood v. Bartholomew* (1995) 516 U.S. 1, 5-6, 116 S.Ct. 7, 133 L.Ed.2d 1 as stating that "evidence that is inad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                              Page 33
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

missible at trial is not 'evidence' at all, for *Brady* purposes." As we previously have observed, in *Wood* 'the United States Supreme Court ultimately found inadmissible polygraph evidence not material under *Brady*. However, *Wood* was not based on a per se rejection of inadmissible evidence as a basis for a *Brady* claim. *Wood* found the evidence not material because, even based on the assumption that this inadmissible evidence might have led respondent's counsel to conduct additional discovery leading to admissible evidence, the evidence's influence on the outcome of the case was speculative." (*People v. Hoyos* (2007) 41 Cal.4th 872, 919, fn. 28, 63 Cal.Rptr.3d 1, 162 P.3d 528.) Accordingly, as *Wood* did not establish that inadmissible evidence can never be material for purpose of a *Brady* claim, it does not support respondent's position here.

[25] We need not decide in this case when, if ever, the prosecution's duty to disclose evidence favorable to a criminal defendant may extend to inadmissible evidence, because it is clear that the undisclosed evidence here, including the Montez letter, would have been admissible at petitioner's capital trial. As long as a witness is given an opportunity to explain or deny his or her prior inconsistent statements (see Evid.Code, § 770), such *577 statements are admissible for the truth of the matter asserted as an exception to the hearsay rule (*id.,* § 1235). At petitioner's trial, Saucedo would have had that opportunity and the Montez letter therefore would have been admissible. Similarly, once Saucedo testified, the other undisclosed evidence, including the testimony of the undisclosed declarants, would have been admissible as well.

In accordance with the foregoing, we conclude that a reasonable probability-that is, a probability sufficient to undermine confidence in the outcome of the proceeding ***204(*United States v. Bagley, supra,* 473 U.S. at p. 678, 105 S.Ct. 3375)-exists that if the Montez letter had been disclosed prior to petitioner's trial, the outcome of the penalty phase would have been different.

[26][27] In the end, the trial judge, not the prosecutor, is the arbiter of admissibility, and the prosecutor's *Brady* disclosure obligations cannot turn on the prosecutor's view of whether or how defense counsel might employ particular items of evidence at trial. "It is not the role of the prosecutor to decide that facially exculpatory evidence need not be turned over because the prosecutor thinks the information is false. It is 'the criminal trial, as distinct from the prosecutor's private deliberations' that is the 'chosen forum for ascertaining the truth about criminal accusations.' " (*U.S. v. Alvarez* (9th Cir.1996) 86 F.3d 901, 905, quoting *Kyles v. Whitley, supra,* 514 U.S. at p. 440, 115 S.Ct. 1555; see also *People v. Hoyos, supra,* 41 Cal.4th at pp. 919-920, 63 Cal.Rptr.3d 1, 162 P.3d 528 ["In deciding whether asserted *Brady* evidence is material to defendant's case, it is therefore appropriate to examine the effect of the evidence on the actual joint proceeding in which **540 defendant was tried"].) "To the extent the prosecutor is uncertain about the materiality of a piece of evidence, 'the prudent prosecutor will resolve doubtful questions in favor of disclosure.' " (*Alvarez,* at p. 905, quoting *United States v. Agurs* (1976) 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342.)

**The Prosecution's Informants and Arrangements**

We turn next to the claim the prosecution's failure to disclose information it received from Barnes, Sanchez, and McDonald, and about arrangements it made with those informants as well as with Montez, violated its *Brady* obligations. (See *Brady, supra,* 373 U.S. 83, 83 S.Ct. 1194.)

*Barnes's information and arrangement*
While incarcerated in the Los Angeles County jail, Saucedo related to Jimmie Barnes numerous details about the Hosey killing. Barnes subsequently was interviewed by an officer in the district attorney's bureau of investigation. Barnes said Saucedo told him that he (Saucedo), petitioner, and *578 two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                   Page 34
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
**(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)**

other persons all participated in stabbing Hosey at a place approximately one block from Saucedo's residence. Saucedo told Barnes he had established an alibi by getting his girlfriend to agree to testify she and Saucedo were at the Egyptian Theatre the night of the murder.

As the referee found, Saucedo's statement to Barnes differs from his trial testimony. Saucedo testified that after he tripped Hosey, petitioner jumped on Hosey and stabbed him to death, while Saucedo tried to stop petitioner and was injured in the attempt. Thus, at trial Saucedo characterized his involvement as that of a Good Samaritan who risked his well-being trying to stop the killing, while subsequently confessing to Barnes that it was actually he who had killed Hosey. Barnes was allowed to plead guilty in an unrelated case to one count of robbery with no immediate state prison time, in exchange for his testimony against Saucedo or petitioner should it become necessary. The circumstances of the deal were not disclosed to petitioner.

The referee also found that disclosure of Barnes's information, and of the prosecution's arrangements with him, would have led to useful defense evidence. Inter alia, disclosure would have enabled the defense to argue the prosecution lacked a good faith belief that Saucedo was truthfully describing petitioner's involvement in the Hosey killing.

#### ***205 Sanchez's information and arrangement

The referee found that Saucedo confessed to Sanchez that he had stabbed a Black drug dealer multiple times in the face and upper torso over a bad drug transaction. Saucedo told Sanchez he had used his own knife and had thrown it onto a riverbank. Saucedo took full credit for stabbing Hosey and never said petitioner had participated.

In April 1981, Sanchez received $150 through the witness protection program. In June 1981, then Deputy District Attorney Ito applied for additional funds, supplying the declaration of a deputy sheriff

that stated: "I have been advised by Deputy District Attorney Lance A. Ito of the Hardcore Gang Division that Marvin Sanchez is a necessary and material witness in the within case because defendant Joe Saucedo related to Marvin Sanchez the manner in which Penal Code section 187 victim Hosey was stabbed to death with such unusual particularity as to indicate that the source of the information was intimately involved in the commission of the crime." The court authorized the requested sum of $650.

Neither Saucedo's inculpatory statement to Sanchez nor the fact that Sanchez received witness protection funds was disclosed to petitioner. The referee found that disclosure of Sanchez's information and the prosecution's *579 arrangements with him would have led to useful defense evidence. The referee also found that the prosecution had dismissed pending charges against Sanchez when he agreed to testify against Saucedo and that he was released and given money to relocate. Had this information been disclosed, the referee concluded, the defense would have used it to argue that the prosecution did not have a good faith belief that Saucedo was truthfully describing petitioner's involvement in the Hosey killing.

#### **541 McDonald's information and arrangement

The referee found that in the early 1980's, Joe Saucedo confessed to fellow inmate Steven McDonald that he had stabbed and killed a man over a drug deal that had gone bad, but that Saucedo threatened to kill McDonald and his family unless McDonald agreed to lie and say that another inmate had actually killed the drug dealer. The referee further found that in December 1981, then Deputy District Attorney Ito noted for the file that he had received a call from a deputy marshal reporting that McDonald had contacted a sheriff's deputy after overhearing Saucedo "cop to his participation in the Hosey 187." That Saucedo had thus inculpated himself to McDonald was not revealed to petitioner. The referee concluded, however, that McDonald's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                      Page 35
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

information would not have led to useful defense evidence because there was no substantial evidence the defense would have been able to persuade Mc-Donald to testify truthfully or to cross-examine Saucedo effectively regarding McDonald's information.

*Montez's information and arrangement*

On November 13, 1980, the district attorney's office was informed that Montez wished to "snitch off" Saucedo. Then Deputy District Attorney Ito arranged with Deputy Los Angeles City Attorney Timothy Hogan that in exchange for Montez's information and agreement to testify against Saucedo, the city attorney's office would not oppose the district attorney's request to modify Montez's 90-day sentence for a recent misdemeanor conviction to an appropriate probationary term. The arrangement was never disclosed to petitioner.***206 As earlier noted, the referee found that if the evidence concerning Montez that the prosecution possessed had been timely disclosed to the defense, Montez would have been available as a witness for the defense and would have testified at petitioner's capital trial, credibly and in conformance with what he wrote in the Montez letter concerning Saucedo's confession to killing Hosey.

Petitioner's trial counsel, Ingber, declared that if the undisclosed information regarding Barnes, Montez, Sanchez, and McDonald had been timely disclosed to him, he would have used it to impeach Saucedo at petitioner's *580 capital trial. Counsel's declaration is consistent with the referee's findings that the defense would have used the undisclosed evidence of the prosecution's arrangements with other potential witnesses to effectively cross-examine Saucedo.

[28][29] The information and arrangements evidence set forth above is favorable to petitioner since, like the Montez letter, it both involves and likely would have led to the jury's hearing of Joe Saucedo's repeated, detailed admissions to stabbing Hosey, destroying evidence, and developing a false

alibi, all of which were inconsistent with his trial testimony inculpating petitioner and favorably characterizing his own role. The evidence also is material in that had the defense been able to illuminate for the jury the pressure that was placed on Saucedo to testify against petitioner, it is reasonably probable the defense's impeachment efforts would have borne fruit and the jury would have discounted Saucedo's testimony.

[30][31][32][33] Moreover, the prosecution's disclosure obligation turns on the collective effect of all suppressed evidence favorable to the defense, not on the effect of such evidence considered item by item. (*Kyles v. Whitley, supra,* 514 U.S. at p. 436, 115 S.Ct. 1555.) "While the definition of ... materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make the disclosure when the point of 'reasonable probability' is reached." (*Id.* at p. 437, 115 S.Ct. 1555.)

Respondent argues that notwithstanding the undisclosed evidence was mainly favorable to petitioner, it was not material because **542 there is no reasonable probability that its nondisclosure deprived petitioner of a fair trial. "Saucedo would have vehemently denied ever making such confessions," asserts respondent, to the effect that all "the undisclosed evidence would have shown in this case was that petitioner was not the actual stabber of Hosey. *However,* the undisputed evidence still showed that petitioner was an *aider and abettor* to Hosey's murder."

We disagree the evidence was not material. The referee found that "the credibility of Saucedo's denial of making the confessions is suspect," while "the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                 Page 36
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

information contained in the Montez letter is credible" and "is corroborated by evidence from other persons who each relate that Saucedo gave essentially the same confession" to them. That the undisclosed evidence concerning Saucedo's confessions to the Hosey killing may be consistent *581 with petitioner's guilt of that crime as well, on an aiding and abetting theory, does not undermine the referee's findings concerning the impact the evidence would have had at ***207 the *penalty* phase of petitioner's trial-viz., that "the defense would have used the undisclosed rebuttal evidence to effectively cross-examine Saucedo, impeaching him on a matter that was of major significance concerning whether the jury would recommend life in prison or the death penalty." (Cf. *In re Hardy* (2007) 41 Cal.4th 977, 1035-1036, 63 Cal.Rptr.3d 845, 163 P.3d 853.)

[34] Nor does the possibility of petitioner's liability for aiding and abetting the Hosey killing foreclose the referee's further finding that had petitioner's counsel in the Hosey matter possessed the undisclosed evidence, he would have advised petitioner not to plead guilty. While the undisclosed evidence does not conclusively absolve petitioner of involvement in the Hosey murder, much of it tends to exculpate him. Although Patricia Torres's statement to police-that she saw petitioner hold a knife by Hosey's neck and, later, chase him down the street-arguably is consistent with petitioner's culpability as an aider and abettor, her statement is the only evidence (apart from Saucedo's self-serving testimony) that petitioner aided and abetted the killing, and at trial she claimed she could not remember what happened. Moreover, Torres was a friend of Saucedo who had known him for four or five years and who lived in the neighborhood. Thus, had the defense possessed all the undisclosed evidence-including Montez's statement that Saucedo had admitted chasing and stabbing Hosey and thereafter persuading his girlfriend to falsely corroborate his story claiming otherwise-petitioner might have argued it was likely that Saucedo had persuaded or coerced Torres to give a similarly false statement.

In any event, the referee reasonably concluded that Saucedo's testimony at the Black penalty phase was a significant factor in Attorney Garber's decision to advise petitioner to plead guilty to the Hosey murder. Moreover, the court ultimately relied upon and accepted Saucedo's testimony as the factual basis for petitioner's guilty plea in the Hosey case.

Respondent cites *U.S. v. Ruiz* (2002) 536 U.S. 622, 122 S.Ct. 2450, 153 L.Ed.2d 586, where the United States Supreme Court held that the Constitution does not require prosecutors to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant. (*Id.* at p. 633, 122 S.Ct. 2450.) In reaching this conclusion, the high court stressed the *Brady* right's relation to the fairness of a trial, along with the long-standing recognition that a defendant may waive various constitutional rights in the context of a guilty plea "despite various forms of misapprehension under which [he or she] might labor."(*Ruiz*, at p. 630, 122 S.Ct. 2450.) The court also found persuasive the likely detriment to the plea bargaining process and the efficient *582 administration of justice in a requirement that prosecutors disclose material impeachment evidence, noting that "the added value ... of the [preplea disclosure of material impeachment evidence] is often limited, for it depends upon the defendant's independent awareness of the details of the Government's case." (*Id.* at p. 631, 122 S.Ct. 2450.)

[35] *Ruiz* does not foreclose relief from petitioner's conviction of the Hosey murder. *Ruiz* by its terms applies only to material *impeachment* evidence, and the high court emphasized that the government there had **543 agreed to "provide 'any information establishing the factual innocence of the defendant' regardless." (*U.S. v. Ruiz, supra,* 536 U.S. at p. 631, 122 S.Ct. 2450.) Here, although the undisclosed evidence would indeed have served an impeachment function in petitioner's penalty trial by casting doubt on the veracity***208 of Saucedo's testimony, in the context of the Hosey case the undisclosed evidence also would have ten-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

182 P.3d 513                                                                                                    Page 37
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522
(Cite as: 43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172)

ded to exculpate petitioner by showing that another person did the killing.

[36] Nor need we decide the broad question whether or to what extent the prosecution has a duty to disclose evidence favorable to a criminal defendant before the defendant pleads guilty.[FN6] The prosecution here plainly had a duty to disclose the evidence at issue before the penalty phase of petitioner's capital trial and, had it done so, petitioner necessarily would have received it before he decided whether to plead guilty to the murder of Hosey. We therefore conclude petitioner has demonstrated entitlement to relief from his second degree murder conviction.

> FN6. The question whether prosecutors must disclose material exculpatory evidence before entering into a plea bargain has been addressed in other states and in the federal courts. While some hold the failure to disclose such evidence entitles a defendant to withdraw his or her guilty plea, others have reached the opposite conclusion. (See cases cited in *McCann v. Mangialardi* (7th Cir.2003) 337 F.3d 782, 787; *Matthew v. Johnson* (5th Cir.2000) 201 F.3d 353, 361-362; *Rhoades v. Paskett* (D.Idaho 2005) 2005 WL 3576845, p. *8; see also *Sanchez v. U.S.* (9th Cir.1995) 50 F.3d 1448, 1453.)

### CONCLUSION

In S058528, habeas corpus relief is granted. The judgment of the Los Angeles County Superior Court in *People v. Miranda,* 1982, No. 362694, is vacated insofar as it imposes a sentence of death. Because the judgment sentencing petitioner to prison is valid in all other respects, he is not presently entitled to release.

In S060781, habeas corpus relief is granted. The judgment of the Los Angeles County Superior Court in *People v. Miranda,* 1983, No. 372157, is vacated. The superior court is to permit petitioner to withdraw his guilty plea.

**\*583** Upon finality of this opinion, the Clerk of the Supreme Court is to remit a certified copy of this opinion to the superior court for filing, and respondent is to serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (b). (See *In re Sixto* (1989) 48 Cal.3d 1247, 1265-1266, 259 Cal.Rptr. 491, 774 P.2d 164; *In re Hall* (1981) 30 Cal.3d 408, 435, fn. 9, 179 Cal.Rptr. 223, 637 P.2d 690.)

WE CONCUR: GEORGE, C.J., and KENNARD, BAXTER, CHIN, MORENO and CORRIGAN, JJ.
Cal.,2008.
In re Miranda
43 Cal.4th 541, 182 P.3d 513, 76 Cal.Rptr.3d 172, 08 Cal. Daily Op. Serv. 5360, 2008 Daily Journal D.A.R. 6522

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 65 North Raymond Avenue, Suite 320, Pasadena, California 91103.

On **June 23, 2008,** I served the foregoing document(s) described as: **NOTICE OF RULING BY CALIFORNIA SUPREME COURT,** on the interested party in this action by placing a true copy original thereof enclosed in a sealed envelope addressed as follows:

**EDMUND G. BROWN, JR.**
**Attorney General of the State of California**
**MICHAEL KATZ**
**Deputy Attorney General**
**300 South Spring Street, Fifth Floor**
**Los Angeles, California 90013**

[X]    **(BY MAIL):** I caused such envelope(s) to be deposited in the mail at Pasadena, California with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[X]    **BY ELECTRONIC SERVICE -** On all recipients designated on the Transaction Receipt located on the CM/ECF website.

[]    **(BY PERSONAL DELIVERY):** I caused such envelope containing the foregoing document to be hand delivered to the individual(s) listed above by delivering the envelope to our messenger and instructing the messenger to hand deliver the envelope to the attorney at the address listed above.

[]    **(BY OVERNIGHT COURIER):** I caused the above-referenced document(s) to be delivered to Federal Express for overnight delivery to the above address(es).

[]    **(BY FACSIMILE MACHINE):** I caused such document and each page thereof to be faxed from transmission fax number (626) 685-2562 to the fax number(s) listed above. I received confirmation generated by the facsimile machine that all pages of the document were properly transmitted to said facsimile number(s).

Executed on **June 23, 2008,** at Pasadena, California.

[]    **(STATE):** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]    **(FEDERAL):** I declare under the penalty of perjury under the laws of the United States that the above is true and correct.

LISA M. WELLS